UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

IN RE:                                                          Chapter 11 Case

MAGNUM CONSTRUCTION MANAGEMENT,                 Case No.: 19-_____
LLC, f/k/a Munilla Construction Management, LLC, [1]

     Debtor.

_____/

## DECLARATION OF DEBTOR'S CHIEF FINANCIAL OFFICER IN SUPPORT OF FIRST DAY PLEADINGS

My name is Gilberto Ruizcalderon.  I am over the age of eighteen and am competent to testify.  I am the Chief Financial Officer of Magnum Construction Management, LLC, f/k/a Munilla Construction Management, LLC ("MCM" or the "Debtor").  I submit this declaration (the "Declaration") in support of the Debtor's petition and First Day Motions.

## I.      INTRODUCTION

1.      In my capacity as Chief Financial Officer of MCM, I have general knowledge of Debtor's business, its books and records, and financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees or advisors, or my opinion based upon my experience with the Debtor's operations and financial condition.    In making the statements herein based upon my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

---

[1]   The Debtor's address is 6201 SW 70th Street, 1st Floor, Miami, FL 33143.  The last four digits of the Debtor's federal tax identification number are 3403.

8561399

2.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion.

3.      I am authorized to submit this Declaration on behalf of the Debtor.

4.      On the date hereof (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.

5.      The Debtor continues to operate its business and manage its assets as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

6.      I am advised by counsel that this Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      No trustee, examiner or official committee of unsecured creditors has been appointed or established in the Chapter 11 Case.

8.      Also on the Petition Date, the Debtor filed its Chapter 11 Plan of Reorganization (the "Plan").

9.      The Debtor commenced this Chapter 11 Case in order to implement a comprehensive restructuring following the catastrophic collapse of the Florida International University Pedestrian Bridge; stabilize its operations for the benefit of its customers, secured creditors, employees, vendors and other unsecured creditors; and propose a mechanism to efficiently address and resolve contingent claims.  To be clear, the filing of this Chapter 11 Case is not the end-result of a strategy, or an attempt, to avoid any responsibility that might be assigned to the Debtor for the heartbreaking and tragic loss of life following the catastrophic

2

collapse of the Florida International University Pedestrian Bridge (described in more detail below).

10.    Rather, the Debtor commenced this Chapter 11 Case after a comprehensive review of all realistic alternatives and the consideration and balancing of a variety of factors, including (i) the Debtor's need for incremental liquidity to be provided under the debtor-in-possession financing arrangements to complete its pending bonded contracts; (ii) the need for an orderly, fair and expeditious process to assess and resolve the Debtor's potential liabilities resulting from the collapse of the Florida International University Pedestrian Bridge; and (ii) how to best preserve and maximize the value of the Debtor's business enterprise for the benefit of all of its economic stakeholders.

11.    More generally, chapter 11 provides the unique opportunity for all of the claims asserted and that may be subsequently asserted against the Debtor arising from the bridge collapse to be addressed comprehensively in one forum. It will avoid the lengthy process necessarily attendant to the state court system and, perhaps more importantly, avoid the risk that, due to the Debtor's financial condition, those claimants having their wrongful death and personal injury claims dealt with earlier in the state court process will fare substantially better than other similarly situated claimants. Chapter 11 mandates that all bridge collapse-related claimants be treated similarly, and provides the statutory framework and tools to accomplish that goal on an expedited basis.

12.    The Plan, which reflects the proposed comprehensive restructuring, is the product of ongoing negotiations between the Debtor, the Debtor's sureties (the largest creditors of the Debtor) and other stakeholders.

13.    To minimize any adverse effects on its business as a result of the commencement of this Chapter 11 Case, the Debtor intends to request various types of relief in certain "first day"

3

applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to (a) continue employee benefits and compensation practices in order to maintain the confidence, morale, and support of the Debtor's employees; (b) permit the Debtor to access much-needed liquidity under post-petition financing arrangements; and (c) establish procedures for the smooth and efficient administration of the Chapter 11 Case. The relief requested in the First Day Motions is crucial to the success of the Debtor's restructuring.

14.     Part I of this Declaration describes the business of the Debtor and the developments which led to the Debtor filing its voluntary chapter 11 petition. Part II sets forth the relevant facts in support of the various first-day motions, emergency or otherwise, and applications filed by the Debtor concurrently herewith. Part III summarizes the Debtor's objectives in this Chapter 11 Case.

## II.     BACKGROUND

**A.     Overview of the Debtor.**

15.     MCM is a construction company specialized in heavy civil construction in the areas of transportation, airport infrastructure, roads, bridges, government buildings and schools. Examples of the projects which MCM has built, or where it was a significant part of the construction team, include Terminal D at the Miami International Airport; the Florida Turnpike Homestead Extension; WT Sampson School at Guantanamo Air Base; Port of Miami Terminal F; and, Terminal 4 East Expansion at Fort Lauderdale-Hollywood International Airport.

16.     The Debtor is headquartered in South Miami, Florida, but also has offices in (i) Broward County, Florida, and (ii) Irving, Texas.  An affiliate of the Debtor, MCM Global, S.A. ("Global") operated in Panama.  Global has discontinued substantially all of its operations and is currently the subject of an involuntary bankruptcy proceeding in the Republic of  Panama.

17.     MCM began its operations as Magnum Construction Management, Corp. ("MCMC") and was incorporated under the laws of the State of Florida on November 29, 1983. I have served as the Company's Chief Financial Officer since October 24th, 2004.

18.     On May 15, 2008, MCMC was converted to a limited liability company formed under Chapter 608 of the Florida Limited Liability Company Act and changed its name to Munilla Construction Management, LLC.   On December 7, 2018, the Debtor changed its name to Magnum Construction Management, LLC.

19.     At its peak, MCM employed 720 employees.  As of the Petition Date, MCM employs a total of 292 employees, of which 285 are full time employees and 7 are part time employees (the "Employees"). Of the 292 Employees, 199 are hourly wage earners, and 93 are salaried personnel.

**B.      Present Day Structure of Operations.**

20.     MCM's senior management team includes: (i) Jorge Munilla, Manager and President; (ii) Fernando Munilla, Manager and Vice President; (iii) Raul Munilla, Manager and Secretary; (iv) Pedro R. Munilla, Manager and Vice President; and (v) Juan Munilla, Manager and Vice President.

**C.      The Debtor's Debt Structure.**

21.     Bank of America, N.A. ("BofA" or "Lender") was MCM's primary senior secured lender through a revolving line of credit facility of up to $25 million evidenced by a Loan Agreement (the "Loan Agreement"), Promissory Note and Security Agreement, each dated June 20, 2014, a Continuing and Unconditional Guaranty by Global and Limited Guaranty provided by each of Jorge Munilla, Raul Munilla, Pedro Munilla and Juan Munilla. The Loan Agreement was amended and restated on May 17, 2016, by letter agreement, and on November 2, 2017, January 24, 2018 and May 1, 2018 by Amendments to Loan Agreement (collectively,

5

the "BofA Loan Facility").  The Debtor's obligations under the BofA Facility are secured by liens on substantially all of MCM's assets.

22.    MCM has financial obligations to several equipment lessors, including 1st Source Bank ("1st") and Caterpillar Financial ("Cat"). The outstanding principal balance due under the equipment leases is approximately $1,500,000.

23.    MCM's total annual revenues and earnings for the fiscal years 2015 – 2017 was:

| FYE: | Total Revenue | Net Income (Loss) |
|---|---|---|
| 2015 | 221,239,933 | 1,755,352 |
| 2016 | 265,074,118 | (1,134,805) |
| 2017 | 296,829,989 | (8,019,237) |

24.    For the year ended December 31, 2018 MCM's total revenue was $126,665,102.

**D.    Surety Lines.**

25.    MCM is required by its construction contracts to obtain payment and performance bonds from sureties.  In the recent past, MCM has obtained bonding from Travelers Insurance Company of America ("Travelers") and Berkshire Hathaway Specialty Insurance Company ("BHSI" or "Berkshire").

26.    As of the Petition Date, Travelers had issued payment and performance bonds for the benefit of obligees on the following projects which are in process (collectively, the "Travelers Bonded Contracts"):

8561399

| PROJECT | DESCRIPTION |
|---|---|
| GTMO WT Sampson | Construction of School in GTMO, Cuba for NAVFAC |
| POM Terminal F | Construction of Seaport Terminal for the Port of Miami |
| T4433 Broward Blvd. | Construction of Roadway Work for FDOT |
| DNT – Parker Rd to SH 121 | Construction of Roadway Work for NTTA |
| Miramar Readiness Ctr | Construction of Readiness Center for US National Guard |
| Madie Ives K-8 | Construction/Renovation of Dade County Public School |
| Twin Lakes Elem | Construction/Renovation of Dade County Public School |
| OpaLocka 54FM | Construction/Installation of Water Main Pipe for MDWASD |
| W Homestead K-8 | Construction/Renovation of Dade County Public School |
| C-111 Detention Area | Construction of Levee for Army Corps of Engineer |
| Port Everglades | Construction of Seawall for Broward County |
| MCC-8-10 | Construction/Renovation of Misc. work for Miami Dade Aviation |
| Liberty Village | Construction of Affordable Housing Multifamily Building |
| NAS Meridian Dining Facility | Construction/Renovation of Dining Facility for NAVFAC |
| TXDOT – FM 423 | Construction of Roadway Work for TXDOT |
| Doral Police Station | Construction of Police Station in Doral |
| Taxiway Bravo Rehab at DLF | Construction of Paving Work for City of Dallas |
| TXDOT – US75 | Construction of Roadway Work for TXDOT |
| FM544 | Construction of Roadway Work for TXDOT |
| FLL Terminal 4 East Expansion | Construction of Airport Terminal in Broward County |
| SFWMD Lakeside Ranch | Construction of Storm Water Treatment Area for SFWMD |
| Heft II | Construction of Roadway Work for FDOT |
| FIU Bridge | Construction of Pedestrian Bridge at FIU |

27.     The Debtor estimates that the cost to complete the Travelers Bonded Contracts approximates $72,175,000.

28.     As of the Petition Date, BHSI had issued payment and performance bonds for the benefit of obligees on the following projects (collectively, the "BHSI Bonded Contracts"):

| PROJECT | DESCRIPTION |
|---|---|
| E4S38 A1A Bridge Rehab | Construction of Roadway and Bridge Rehab for FDOT |
| Florida City Elementary | Construction/Renovation of Dade County Public School |
| Joseph Caleb Center | Construction/Renovation of Dade County Community Center |
| Reagan-Doral | Construction/Renovation of Dade County Public School |
| Grove Bay Parking | Construction of Parking Garage for City of Miami |
| FM2181 Denton County | Construction of Roadway Work for TXDOT[2] |
| Lake Sharon Drive | Construction of Paving & Drainage for City of Corinth |
| Love Field Glide Slope | Construction of Paving Work for City of Dallas |

---

[2] As discussed below, on January 25, 2019, the Texas Department of Transportation delivered a notice terminating its contract with the Debtor.  The Debtor and BHSI are disputing the termination.

29.     The Debtor estimates that the cost to complete the BHSI Bonded Contracts approximates $18,101,000.

**E.      Expansion Outside of Florida**

30.     Due to the downturn in the Florida market in 2010, MCM decided to expand into two other markets, Panama and Texas.  MCM opened offices in both locations and deployed workers into each. Global's operations in Panama required the involvement of numerous expats as well as constant support from the home office in Miami. This drastically increased costs since expats had to be given increased compensation packages as well as housing costs, travel expenses, etc.  The very slow payment process of the Panamanian government made it necessary for Global to factor its receivables with local banks in Panama and continuously capitalize the ongoing operations. Since the factoring costs were not anticipated in the bidding of the projects, the profitability on all projects was reduced.  Global became liquidity constrained.  As of November 30, 2018, it owed MCM approximately $22 million.  Global has discontinued substantially all its operations. It is not soliciting new work and maintains an office and a small staff in order to try to collect open claims against the Panamanian government.

31.     Market research showed that the Texas economy was booming and, therefore, MCM decided to expand in order to meet the increased demand it perceived to exist in that market.   Unfortunately, much time, effort and resources were spent pursuing general construction work and not one project was landed. All of the projects in Texas were civil projects. The competition in the region is fierce and, thus, margins had to be reduced in order to obtain work. Labor shortages along with the risk of losing key employees led to substantial labor cost increases that were not originally anticipated. The leadership in Texas was inexperienced and needed support from Florida. However, because of the problems in Panama and the

resurgence in the Florida market, MCM did not have sufficient resources to provide the Texas market the attention it required. No additional work is being solicited in Texas and the focus is on finishing the approximate $7.95 million of work in process.

**F.     Events Leading to the Filing of the Chapter 11 Case**

32.     MCM was the contractor on the FIU Pedestrian Bridge that collapsed on March 15, 2018.  The cause of the tragic collapse remains under investigation by the National Traffic Safety Board (the "NTSB").  MCM is a party to the NTSB investigation and is fully cooperating with the NTSB.  As of the date hereof, MCM is a defendant in 18 lawsuits alleging personal injuries or wrongful death arising from the accident.  While MCM's insurer is currently defending these claims under a reservation of rights, MCM has lost its Florida Department of Transportation certifications and approximately $200 million in potential revenue from future projects.  The culmination of these tragic events materially constrained MCM's liquidity and its ability to generate revenue such that the Company cannot meet its ongoing obligations.  MCM remains dedicated to delivering quality work—a commitment that has made it a successful company for the past 35 years.  It continues to work closely with the NTSB.

**G.     Prepetition Restructuring Initiatives.**

**a.     Restructuring of Bank of America Loans.**

33.     The Bank of America Line of Credit matured and became due and payable on March 31, 2018.  At maturity, the Debtor owed Bank of America $11,138,200.68.  The Debtor and Bank of America engaged in good faith discussion regarding the bank's forbearance from the enforcement of rights or remedies following maturity of the loan, and with respect to the Debtor's liquidity needs.  Those discussions culminated in the execution of further amendments to the Loan Agreement.  Pursuant to the amendments dated May 1, 2018:

8561399

a.  The members of the Debtor caused a non-debtor, 6201 of Miami, LLC, a Florida limited liability company ("6201"), to pledge the real property owned by it to secure $4 million of indebtedness owed by the Debtor to Bank of America.  Bank of America reduced the Debtor's liability under the line of credit by $4 million;

b.  In addition to reducing the line of credit by $4 million, Bank of America and the Debtor agreed to allocate an additional $4.125 million of indebtedness to a new equipment loan to be secured by a lien on MCM's equipment (the "Equipment Loan").  The Equipment Loan matures on April 30, 2019 and requires the Debtor to make monthly payments of principal and interest in the amount of $22,223 per month until maturity; and

c.  The maturity date of the line of credit note, now in the reduced amount of $2,942,591, was extended to April 30, 2019.

34.  In sum, the Debtor's obligations to Bank of America were reduced by $4,000,000; the remaining indebtedness was "bifurcated" into an equipment loan in the amount of $4,125,000; and the term of the line of credit note, in the reduced amount of $2,942,590.68, was extended for one year.  The Debtor, however, lost its access to working capital financing as Bank of America capped the amount of the line of credit.  The Debtor did not have availability under the line and was required to finance its operations from its collections.

35.  Given the Debtor's constrained liquidity, the Debtor could not meet its financial obligations under the Travelers Bonded Projects and the BHSI Bonded Projects.  While construction on those projects was performing, and continues to perform, the Debtor did not have the liquidity to timely pay its subcontractors and materialmen on those projects.  Therefore, the Debtor, Travelers and BHSI began discussions regarding the Debtor's need for incremental liquidity.

8561399

**b. Travelers' Surety Credit.**

36.     Pursuant to (i) the Trust Agreement dated July 23, 2018, by and among Debtor, Travelers, Mattson Driscoll & Damico LLP, and others, as amended by the First Amendment to Trust Agreement dated as of August 30, 2018; (ii) the Collateral Reimbursement Agreement dated July 23, 2018, by and among Debtors, Travelers, and others, as amended by the First Amendment to Collateral/Reimbursement Agreement dated as of August 30, 2018, and by Second Amendment to Collateral/Reimbursement Agreement dated September 20, 2018; and (iii) Collateral Agent Agreement dated as of July 23, 2018, by and among Debtor, Travelers, and U.S. Bank, Travelers has provided $17,783,561.55 million in financing to the Debtor (through March 1, 2019) to pay bonded payables, pay direct job costs and fund a portion of the Debtor's general and administrative expenses.  Travelers' advances to the Debtor are secured by, *inter alia*, first priority liens on the Travelers Bonded Contracts and their proceeds, and junior liens on substantially all of the Debtor's other assets.

**c. BSHI Surety Credit.**

37.     Pursuant to the Trust and Financing Agreement dated July 19, 2018, between the Debtor and BHSI, BHSI has provided $4,072,470.14 million in financing to the Debtor (through February 28, 2019 and inclusive of fees and expenses) to pay bonded payables, pay direct job costs and fund a portion of the Debtor's general and administrative expenses.  BHSI's advances to the Debtor are secured by, *inter alia*, first priority liens on the BHSI Bonded Contracts and their proceeds, and junior liens on substantially all of the Debtor's other assets.

38.     Travelers and BHSI are parties to an inter-creditor agreement dated August 8, 2018 (the "Inter-Creditor Agreement") that sets forth their respective priority in and to the collateral and its proceeds.

8561399

**d. Cost Cutting Initiatives.**

39.     MCM has taken the initiative to cut general and administrative expenses from approximately $12.6 million annually to roughly $4.8 million.  Many positions have been eliminated. The officers have taken salary reductions and the main office has been reduced. At its headquarters, MCM has reduced its footprint from three floors to one floor, representing a savings of $26,521 monthly in occupancy expense.

**e. Termination of FM 2181 Project.**

40.     The FM 2181 project is a $35 million contract issued by the Texas Department of Transportation ("TXDOT") involving the widening of a 2-lane rural road into a 6-lane divided, urban highway.  The project is a joint effort between the City of Denton, Texas and TXDOT. MCM was awarded the project on August 3, 2017 and BHSI issued a payment and performance bond.  MCM began work on the project on November 6, 2017.

41.     MCM contends that TXDOT failed to include information regarding underground utilities and improvements requested by the City of Denton.  MCM asserts that TXDOT has failed to resolve, among other things, conflicts in underground utilities which has substantially delayed completion of the project.  There is extensive written communication from MCM to TXDOT regarding the delays occasioned by the utility conflicts – which MCM does not control and could not have known about prior to starting its work.

42.     On January 25, 2019, TXDOT delivered written notice of its election to terminate MCM under the contract and instructed MCM and its subcontractors to demobilize and leave the worksite.  Under a full reservation of rights, MCM has begun demobilizing.  MCM and BHSI contend that the termination was based on a wrongful default because the delays are attributable to TXDOT's failure to include critical information in the bid qualifications, their failure to resolve utility conflicts, which have caused MCM's utility subcontractor to work out of sequence

12

8561399

and inefficiently, and their failure to comply with the 5-day schedule reviews per TXDOT specifications. MCM intends to enforce its rights and remedies under the contract and applicable law.

**H.    Objectives of Chapter 11 Filing.**

43.    On the Petition Date, the Debtor filed its schedules of assets and liabilities and statement of financial affairs (the "Schedules"). The Schedules disclose approximately $24,771,237 in secured claims, $73,398 in priority unsecured claims and $22,602,494 in general unsecured claims, excluding contingent and unliquidated claims.

44.    The Debtor's immediate objective is to stabilize its operations by obtaining the relief requested in the First Day Motions and then proceed expeditiously towards the goal of restructuring of its financial affairs for the benefit of its customers, secured creditors, employees, vendors, and other unsecured creditors.

45.    MCM has coverage with policy limits totaling approximately $42 million under policies of insurance issued by Greenwich Insurance Company, XL Insurance America, Inc., Indian Harbor Insurance Company (individually, "GIC," "XLIA" and "IHIC" and, collectively, "XL") and The Ohio Casualty Insurance Company ("Ohio Casualty"). Ohio Casualty and XL are collectively referred to as the "Insurers."

46.    Subject to a reservation of rights, GIC has provided MCM with a defense in the litigation brought against MCM, and others, as a result of the collapse of the FIU Pedestrian Bridge.

47.    MCM and the Insurers have been engaged in good faith negotiations regarding the Insurers' contribution of the policy limits to enable MCM to establish a settlement trust or fund that MCM believes will enable MCM to fully resolve all claims asserted against MCM relating to the collapse of the FIU Pedestrian Bridge. Under this proposal the Insurers would pay the

13

applicable policy limits of the insurance policies, totaling approximately $42 million, thereby fully and completely exhausting the policy limits and extinguishing each Insurer's obligations under the insurance policies, in consideration of MCM's agreement to fully and completely release each Insurer from any and all claims arising out of, relating to or in any way involving the collapse of the FIU Pedestrian Bridge.  MCM has requested that the insures contribute the proceeds from the insurance policies to a trust or fund for the exclusive benefit of all claims arising from, relating to or in any way involving the collapse of the FIU Pedestrian Bridge, which claims would be channeled exclusively to the trust or fund.  The plan contemplated by MCM would also require, among other things, that the Insurers, MCM and certain parties that MCM is obligated to indemnify be released from any and all claims arising from, relating to or in any way involving the collapse of the FIU Pedestrian Bridge, and that such claims be enjoined. The parties' discussions are ongoing.

48.    MCM has filed its proposed plan of reorganization that does not yet incorporate all of the arrangements being discussed with the Insurers; however, MCM anticipates filing an amended plan of reorganization shortly.

## III.    FIRST-DAY MOTIONS

49.    Concurrently with the filing of this Chapter 11 Case, the Debtor filed a number of First Day Motions. The Debtor respectfully requests that the Court conduct a hearing as soon as possible after the commencement of the Chapter 11 Case (the "First Day Hearing") to consider the First Day Motions.

50.    I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to restructure its financial affairs and to avoid immediate and irreparable harm to the Debtor's estate.

8561399

**A.     Debtor's Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Jordi Guso and the Law Firm of Berger Singerman LLP as Counsel for Debtor-in-Possession,** *Nunc Pro Tunc* **to Petition Date (the "<u>BSLLP Application</u>").[3]**

51.     The Debtor seeks authority to retain, on an interim basis, Jordi Guso and the law firm of Berger Singerman LLP ("<u>BSLLP</u>") as general bankruptcy counsel *nunc pro tunc* to the Petition Date. As detailed in the BSLLP Application, the Debtor understands that Mr. Guso and BSLLP have extensive experience representing chapter 11 debtors in this district (and other districts across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtor.  The Debtor believes it is in its best interests, and those of its creditors, that Mr. Guso and BSLLP be retained to serve as Debtor's general bankruptcy counsel in its Chapter 11 Case.

52.     To the best of the Debtor's knowledge, except as disclosed in the *Declaration of Jordi Guso on Behalf of Berger Singerman LLP, as Proposed Counsel for the Debtor-In-Possession, Nunc Pro Tunc to the Petition Date*, affirmed by Mr. Guso and attached to the BSLLP Application as Exhibit "A", neither Mr. Guso nor BSLLP has any connection with the Debtor's creditors or other parties in interest or their respective attorneys. Counsel has informed me that limited liability companies like MCM may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtor requires the Court's approval of debtor-in-possession financing to continue to operate.  Without access to the financing, the Debtor will be unable to operate and maximize value for the benefit

---

[3] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the respective motion or application, as defined, in this section of the Declaration.

of its estate. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief has been granted in numerous chapter 11 cases in this District, including large chapter 11 cases. *See*, *e.g.*, *In re National Auto Lenders, Inc.*, Case No. 18-24586-LMI (Bankr. S.D. Fla. Dec. 20, 2018); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. April 21, 2015); *In re McGuire Holdings*, Case No. 11-39347-RAM (Bankr. S.D. Fla. Oct. 27, 2011); *In re HearUSA, Inc.*, Case No. 11-23341-EPK (Bankr. S.D. Fla. May 20, 2011); *In re Gulfstream Intern. Group, Inc.*, Case No. 10-44131-BKC-JKO (Bankr. S.D. Fla. Nov. 8, 2010); *In re Medical Staffing Network Holdings, Inc., et al.*, Case No. 10-29101-BKC-EPK (Bankr. S.D. Fla. July 8, 2010); *In re Gemini Cargo Logistics, Inc., et al.*, Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Fin. Services, LLC*, Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Jan. 28, 2008); *In re Tousa, Inc.*, Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008) and by other bankruptcy courts throughout the country. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain BSLLP as the Debtor's corporate restructuring counsel.

**B.      Debtor's Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Gulf Atlantic Capital Corporation as Financial Advisor to the Debtor, *Nunc Pro Tunc* to the Petition Date (the "<u>Gulf Atlantic Application</u>").**

53.      The Debtor seeks authority to retain, on an interim basis, Gulf Atlantic Capital Corporation ("<u>Gulf Atlantic</u>"), *nunc pro tunc* to the Petition Date, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. The Debtor understands that Gulf Atlantic has significant and extensive experience in providing advisory services to companies undergoing a financial restructuring, including in chapter 11 bankruptcy cases. The Debtor understands that Gulf Atlantic has an excellent reputation for providing such services throughout the United States in restructuring matters, and that it is well-qualified to provide services to the Debtor in this case.

16

8561399

The Debtor believes that it is in its best interests, and those of its creditors, that Gulf Atlantic be retained to serve as financial advisors to the Debtor in its Chapter 11 Case.

54.     The Debtor initially employed Gulf Atlantic on December 11, 2017. In that capacity, Gulf Atlantic has reviewed the financial and operating performance of the Debtor, reviewed and helped manage the Debtor's operating budgets and liquidity, and advised the Debtor in regard to restructuring its financial affairs for the benefit of all constituencies. The continued post-petition retention of Gulf Atlantic is in the best interests of the Debtor.

55.     Due to Gulf Atlantic's extensive experience in restructuring matters, and in light of the prepetition work done for the Debtor by Gulf Atlantic, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of Gulf Atlantic in this case from the start of this Chapter 11 Case. It is, therefore, my belief that only with the granting of an order approving Gulf Atlantic employment will such immediate and irreparable injury be avoided.

**C.      Debtor's Emergency Application for Approval of Employment of Kurtzman Carson Consultants, LLC as Notice, Claims and Solicitation Agent of the Bankruptcy Court, *Nunc Pro Tunc* to Petition Date.**

56.     The Debtor seeks approval of its agreement with Kurtzman Carson Consultants, LLC ("KCC") and appointment of KCC as notice, claims, and solicitation agent of the Court (the "Claims and Noticing Agent").  I am advised that KCC has substantial experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. I am further advised that KCC has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in this and other districts nationwide. *See, e.g., In re Waypoint Leasing Holdings Ltd., et al.*, Case No. 18-13648 (Bankr. S.D.N.Y. 2018); *In re Heritage Home Group, LLC, et al.,* Case No. 18-11736 (Bankr. D. Del. 2018); *In re Keystone Tube Company, LLC*, Case No. 17-11330 (Bankr. D. De. 2017); *In re TSA WD Holdings, Inc., et al. (f/k/a Sports Authority*

*Holdings, Inc.)*, Case No. 16-10527 (Bankr. D. Del. 2016); *In re Momentive Performance Materials (MPM Silicones, LLC)*, Case No. 14-22503 (Bankr. S.D.N.Y. 2014); *In re TeleFree, LLC,* Case No. 14-40987 (Bankr. D. Mass. 2014); *In re City of Detroit, Michigan,* Case No. 13-53846 (Bankr. E.D. Mich. 2013); *In re ATP Oil & Gas Corporation, et al.,* Case No. 12-36187 (Bankr. S.D. Tex. 2012); *In re Maguire Group Holdings, Inc., et al.* Case No. 11-39347 (Bankr. S.D. Fla. 2011); *In re 1800HOTELS4U, LLC, et al.*, Case No. 10-16648 (Bankr. S.D. Fla. 2010); *In re Fontainebleau Las Vegas Holdings, LLC, et al.,* Case No. 09-21481 (Bankr. S.D. Fla. 2009); *In re Mercedes Hones, Inc., et al.*, Case No. 09-11191 (Bankr. S.D. Fla. 2009); *In re TOUSA, Inc.,* Case No. 08-10928 (Bankr. S.D. Fla. 2008); *In re Levitt and Sons,* LLC, No. 07-19845 (Bankr. S.D. Fla. Nov. 14, 2007). The approval of the Debtor's agreement with KCC and KCC's appointment as notice, claims, and solicitation agent of the Court will facilitate the orderly and efficient management of this Chapter 11 Case.

**D.      Debtor's Emergency Motion (i) to Establish the Bar Dates for Filing Proofs of Claims and Interests; (ii) to Estimate Claims; and (iii) for Approval of (a) Form and Manner of Notice of Chapter 11 Case and (b) Form for Filing Proofs of Claim (the "<u>Bar Date Motion</u>").**

57.      The Debtor seeks entry of an order setting the Bar Date for the filing of Claims (including claims under 11 U.S.C. § 503(b)(9) and Interests, estimating Claims scheduled as contingent, unliquidated or disputed at or before confirmation, or within 7 days of the hearing on confirmation of the Plan and approving the form and manner of notice of the commencement of this Chapter 11 Case and the form for filing Proofs of Claim.

58.      The Debtor requests that the Court set the Claims (including those filed by 503(b)(9) claimants) and Interests Bar Date to April 15, 2019, and the Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) bar date to August 26, 2019. On the Petition Date, the Debtor filed the Plan. I am advised that, by operation of Local Rule 3003-1(A), absent

8561399

an order authorizing the relief requested herein, the Claims and Interests Bar Date will be set 90 days after the 341 meeting of creditors. Given that the Debtor intends to diligently seek confirmation of the Plan, and then continue operating its business outside of bankruptcy, the Debtor respectfully requests that the Bar Date for filing Claims and Interests should be set for March 29, 2019, and the Governmental Unit Bar Date set for August 7, 2019.

59.     The Debtor requests that the Court estimate Claims scheduled as contingent, unliquidated or disputed at or before confirmation of the Plan.  I am advised that Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018 provide the substantive and procedural mechanism for the Court to estimate Claims the Debtor schedules as contingent, unliquidated or disputed at or before confirmation of the Plan.  Estimating claims so that creditors can vote on the Plan by the deadline to be set by the Court will facilitate the expedited confirmation process contemplated by the Debtor in this Chapter 11 Case.

60.     The Debtor proposes that the deadline requested in the Bar Date Motion to file a Proof of Claim (including claims under 11 U.S.C. § 503(b)(9)) or Interest apply to all Persons or Entities or Interest (each as defined in sections 101(41) and 101(15) of the Bankruptcy Code) holding Claims against the Debtor (whether secured, priority or unsecured) that arose prior to the Petition Date.

61.     The Debtor requests that it retain the right to: (a) dispute, contest, setoff, recoup, and assert any defenses, counterclaims or subordination against, any filed Claim or any Claim listed or reflected in the Schedules as to nature, amount, liability, classification, or otherwise; or (b) subsequently designate any claim as disputed, contingent, or unliquidated.

62.     The Debtor further requests that pursuant to Bankruptcy Rule 3003(c)(2), any Person or Entity that is required to file a Proof of Claim but fails to do so in a timely manner shall be forever barred, estopped, and enjoined from:  (a) asserting any Claim against the Debtor

19

that (i) is in an amount that exceeds the amount, if any, that is set forth in the Schedules, or (ii) is of a different nature or in a different classification (any such Claim referred to as an "Unscheduled Claim"); and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in this Chapter 11 Case in respect of an Unscheduled Claim.

63.    In providing notice of the Bar Dates, the Debtor will provide to holders of Claims a customized proof of claim form (the "Proof of Claim Form") similar in form to that attached as Exhibit "A" to the Bar Date Motion. Subject to Court approval, the Debtor has retained KCC as its Claims and Noticing Agent.  The Debtor proposes that for any Proof of Claim Form to be timely and properly filed, a signed original of the completed Proof of Claim Form, together with accompanying documentation, must be sent so as to be received by the Claims and Noticing Agent, at the address indicated on the Bar Date Notice (as defined below), on or before the applicable Bar Dates.

64.    Given the factual complexities of the instant case, the Debtor proposes to provide actual written notice of the commencement of this Chapter 11 Case and the Bar Dates to all known persons and entities holding Claims for whom the Debtor have an actual deliverable address.

65.    In giving actual notice to known Persons and Entities who may have a Claim, the Debtor proposes to give notice of the commencement of this Chapter 11 Case and Bar Dates, substantially in the form of the notice attached as Exhibit "B" (the "Bar Date Notice") to the Bar Date Motion, in accordance with Bankruptcy Rule 9007, so that the Bar Date Notice is served by first class mail within ten (10) business days after entry of an Order granting that Motion.

66.    In order to provide supplemental notice and notice to creditors for which the Debtor may not have a deliverable address, or unknown creditors, the Debtor also proposes to publish the Bar Date Notice twice, (a) first, not more than ten (10) business days after entry of an

8561399

Order granting this Motion on the Court's docket and (b) second, not later than thirty (30) days prior to the General Bar Date, in the publication listed in Exhibit "C" (the "<u>Publication Notice</u>") to the Bar Date Motion. The Bar Date Notice and the Publication Notice will provide creditors with notice of the commencement of this Chapter 11 Case and sufficient information to allow them to timely file a properly prepared and executed Proof of Claim and otherwise participate in this Chapter 11 Case if and to the extent necessary and/or desired.

67.     The relief sought through the Bar Date Motion will facilitate an expedited and efficient method by which the Debtor can reorganize through the chapter 11 process and, in so doing, minimize expenses, all to the benefit of the Debtor's creditors and other parties in interest.

**E.      Debtor's Emergency Motion for Order (I) Authorizing Debtor to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtor to Maintain Employee Benefit Programs, and (III) Directing Banks to Honor Related Prepetition Transfers (the "<u>Employee Motion</u>").**

68.     The Debtor seeks the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will destroy the Debtor's relationships with the employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical. The Debtor faces the imminent risk that its operations may be severely impaired beyond that resulting from the March 15, 2018, incident if the Debtor is not immediately granted authority to make the payments described in the Employee Motion.  Employee support for the Debtor's reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtor's customers and operations.  At this critical early stage of this Chapter 11 Case, the Debtor simply cannot risk the substantial disruption to its business operations that would inevitably attend any decline in work force morale attributable to the Debtor's failure to pay employee compensation, deductions, and benefits in the ordinary course.

8561399

Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtor must continue its corporate policies of permitting certain employees to incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.

69.     Counsel advises that relief similar to that sought in the Employee Motion has been granted by Courts in this and other Districts in Florida. *See, e.g., In re National Auto Lenders, Inc.,* Case No. 18-24586-LMI (Bankr. S.D. Fla. Nov. 29, 2018); *In re Goodman and Dominguez, Inc., et al.*, Case No. 17-17237-RAM (Bankr. S.D. Fla. July 7, 2017); *In re Campbellton-Graceville Hospital Corporation,* Case No. 17-40185-KKS (Bankr. N.D. Fla. May 11, 2017); *In re Wood Resource Recovery, L.L.C.,* Case No. 16-10014-KKS (Bankr. N.D. Fla. Feb. 11, 2016); *In re Goodman and Dominguez, Inc., et al.*, Case No. 16-10056-RAM (Bankr. S.D. Fla. Jan. 1, 2016); *In re Adinath Corp., et al.,* Case No. 15-16885-LMI (Bankr. S.D. Fla. April 17, 2015). Accordingly, I believe that is in the best interests of the Debtor, its estate and creditors to seek the relief requested in the Employee Motion.

70.     By separate motion, described below, the Debtor also is requesting authority to file under seal the schedule disclosing, among other things, the names of its 292 employees, amount of compensation sought to be paid, and withholding amounts in order to maintain personal and sensitive information and avoid potential friction among employees with disparate compensation that might arise from publication of this information.

**F.     Debtor's Emergency Motion to File Under Seal Unredacted Schedule to Employee Wage and Benefit Motion (the "Motion to File Under Seal").**

71.     In connection with the filing of the Employee Motion, Local Rule 9013-1(I)(1) requires that with respect to proposed payment of prepetition wages or compensation, a debtor disclose, in a schedule, among other things, (a) the names of the employees to whom wages or

compensation are sought to be paid, (b) amount due such employees as of the bankruptcy filing, (c) the amounts to be withheld from such wages or compensation, including all applicable payroll taxes and related benefits, (d) the period of time for which prepetition wages or compensation are due, (e) whether the employee is presently employed by the debtor, and (f) whether any of the employees are insiders as defined in 11 U.S.C. § 101(31) (the "Employee Schedule"). Accordingly, absent specific relief to the contrary, the Debtor will be required to make publicly known the compensation of the Debtor's 292 employees. Making payroll information available to all of the employees and the general public may cause widespread employee anxiety and discord, particularly if employees are earning disparate compensation. For this reason, the Debtor seeks authority to file the Employee Schedule containing personal, sensitive information under seal, and to provide a copy of the Schedule to the Office of the United States Trustee.

72.     I understand from counsel that Section 107(b) the Bankruptcy Code, as effectuated through Rule 9018 of the Federal Rules of Bankruptcy Procedure, provides the mechanism though which a bankruptcy court can, if justice so requires, protect an entity with respect to "commercial information," and that Local Rule 5003-1(D) provides the mechanism for the Court to authorize the filing of papers under seal, such as the Employee Schedule. I further understand from counsel that bankruptcy courts in this district have authorized the filing under seal of matters related to or concerning the initial filing of chapter 11 bankruptcy cases, including the same materials as requested herein. *See, e.g., In re Ruden McClosky, P.A.*, Case No. 11-40603-RBR (Bankr. S.D. Fla. Nov. 7, 2011); *see also In re Cima Mtg. Bankers*, Case No. 05-15121-RAM (Bankr. S.D. Fla. June 7, 2005) (order authorizing debtors to file list of 20 largest creditors, matrix, schedules and statements of financial affairs under seal).

8561399

73.     Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to be able to file the Employee Schedule Under seal and to provide a copy to the Office of the United States Trustee.

**G.     Debtor's Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks, and (II) Continue to Use Existing Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines (the "Cash Management Motion").**

74.     I understand from counsel that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. I understand from counsel that these guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. I understand from counsel that these requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. In the Cash Management Motion, the Debtor seeks a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

75.     The Debtor requests that the Court authorize the Debtor to continue certain cash management procedures involving use of non-debtor accounts that are required under certain agreements with Travelers and BSHSI relating to projects bonded by each of the Sureties.  The Debtor also requests authority to maintain two operating accounts (collectively, the "Pre-Petition Operating Accounts") at SunTrust Bank, N.A. ("SunTrust") and Community Bank solely for the purposes of receiving deposits or payments.  The Debtor will not make any post-petition

24

disbursements from the Pre-Petition Operating Accounts.  The Debtor further requests authority to maintain its payroll account (the "Pre-Petition Payroll Account") at SunTrust Bank solely for the purposes of making payroll and related tax payments.

76.     The management of proceeds of the Travelers Bonded Contracts is governed by the following agreements (collectively, the "Travelers CMS Agreements"): (1) the Collateral/Reimbursement Agreement dated July 23, 2018, among the Debtor, Travelers, and certain indemnitors of Travelers  (as amended, the "Travelers CRA"); (2) the Trust Agreement dated July 23, 2018, among the Debtor, Travelers, and Matson, Driscoll & Damico, LLP, as agent for Travelers (as amended, the "Trust Agreement"); (3) the Collateral Agent Agreement dated July 23, 2018,  among Travelers, Debtor, and US Bank (the "Travelers/US Bank CTA").

77.     The management of the proceeds of the BHSI Bonded Contracts is governed by the Trust, Financing and Collateral Reimbursement Agreement dated July 19, 2018 (the "Berkshire CMS Agreements").

78.     The Travelers CMS Agreements and the Berkshire CMS Agreements were put in place as an acknowledgment of each surety's superior interest under applicable law in the contract balances associated with the respective bonded contracts until the contracts are completed, all subcontractors and suppliers are paid, all surety loss is reimbursed, and the surety has no further exposure under any of the bonds issued by each such surety.  Pursuant to the foregoing agreements, the proceeds of each surety's bonded contracts are to be remitted to the respective trust accounts and the proceeds used to pay direct job costs, indirect job costs and other payables related to the applicable bonded contract.

79.     In furtherance of the cash management needs of the Debtor, the Debtor requests that the Court authorize the banks involved in the management of the funds relating to the Travelers Bonded Contracts and BHSI Bonded Contracts, as identified below (collectively, the

"Banks") to: (a) continue to maintain, service and administer the respective bank accounts; (b) debit the respective bank accounts in the ordinary course of business on account of (i) checks drawn on the respective bank accounts that are presented for payment at the bank or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the respective bank accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges, if any, owed to the respective bank as of the Petition Date on account of the maintenance of the cash management system; and (c) otherwise comply with all terms of the Travelers CMS Agreements or the Berkshire CMS Agreements, as applicable.

### Cash Management Related to Travelers Bonded Contracts

80.      Travelers (and other sureties that issued bonds at the request of Travelers) is surety on approximately 22 bonded contracts (the "Travelers Bonded Contracts).  The Travelers Bonded Contracts are in various stages of completion and will require significant infusion of cash in order to complete the same and recover the outstanding contract balances and retainage. On July 23, 2018, in recognition of the rights of Travelers in the Travelers Bonded Contracts and in order to increase the availability of working capital necessary to complete the outstanding projects, the Debtor executed the Travelers CRA and the Trust Agreement, along with certain other loan documents with Travelers, which, among other things, provided loan advances necessary for continued operations and provided particular cash management procedures applicable to all proceeds of Travelers Bonded Contracts.  The procedures applicable to the Travelers Bonded Contracts included establishing the following accounts (collectively, the "Travelers Accounts") for the following purposes:

8561399

a. <u>Collateral Agent Account</u>:  All proceeds of federal Travelers Bonded Contracts are delivered to US Bank, which serves as collateral agent for Travelers.  US Bank is a party to the Collateral Agent Agreement dated July 23, 2018, which outlines the duties and obligations of US Bank as collateral agent.  Upon receipt, US Bank deposits funds received in accordance with the Collateral Agent Agreement into an account at US Bank held in the name of and owned by Travelers (the "<u>Collateral Agent Account</u>"). The funds in the Collateral Agent Account are swept regularly into the Lock-Box Account (described below).

b. <u>Lock-Box Account</u>:  All proceeds of non-federal Travelers Bonded Contracts and certain advances made by Travelers, are deposited into a lock-box account at PNC Bank, set up in the name of Matson, Driscoll & Damico, LLP, as agent for Travelers (the "<u>Lock-Box Account</u>").  Additionally, funds initially deposited into the Collateral Agent Account are swept regularly into the Lock-Box Account. The funds in the Lock-Box Account are then transferred as needed to cover disbursements to subcontractors and suppliers on Travelers Bonded Contracts, which disbursements are made from the Trust Account (described below). Additionally, funds from the Lock-Box Account have been, and may continue to be, used to fund transfers to the Debtor's operating accounts for general operating expenses, including payroll, upon consent by Travelers.

c. <u>Trust Account (ZBA)</u>:  The Trust Account at PNC Bank, set up in the name of Matson, Driscoll & Damico, LLP, as agent for Travelers, is a zero-balance account funded directly from the Lock-Box Account.  The Trust Account serves as the vehicle for payment of subcontractors and suppliers on the Travelers Bonded Contracts.

27

81.     The Travelers Accounts are all held in the name of Travelers, either directly or through an authorized agent of Travelers, as account owner. Additionally, pursuant to the Travelers CMS Agreements and related recorded UCC financing statements, Travelers has a perfected security interest in each of the Travelers Accounts, as well as rights in the account balances arising by equitable subrogation and other applicable law.

## Cash Management Related to BHSI Bonded Contracts

82.     Berkshire is surety on approximately 8 bonded contracts. The BHSI Bonded Contracts are in various stages of completion and will require significant infusion of cash in order to complete the same and recover the outstanding contract balances and retainage. On July 19, 2018, in recognition of the rights of Berkshire in the BHSI Bonded Contracts and in order to increase the availability of working capital necessary to complete the outstanding projects, the Debtor executed the Berkshire CMS Agreement which, among other things, provided loan advances necessary for continued operations and provided particular cash management procedures applicable to all proceeds of BHSI Bonded Contracts. The procedures applicable to the BHSI Bonded Contracts included establishing the following accounts (collectively, the "Berkshire Accounts") for the following purposes:

     a.  Receiving Account:  All proceeds of BHSI Bonded Contracts and certain advances made by Berkshire, are deposited into an account at Wells Fargo Bank, set up in the name of Alan Gray LLC/FBO Berkshire Hathaway/Munilla Construction Management. Alan Gray, LLC, serves as the Funds Control Manager for the Account. The funds in the Receiving Account are then transferred as needed to cover disbursements to subcontractors and suppliers on BHSI Bonded Contracts, which disbursements are made from the Disbursing Account (described below). Additionally, funds from the Receiving Account

have been, and may continue to be, used to fund transfers to the Debtor's operating accounts for general operating expenses, including payroll, upon consent by Berkshire.

b. <u>Disbursement Account</u>:  The Disbursement Trust Account at Wells Fargo Bank, set up in the name of Alan Gray LLC/FBO Berkshire Hathaway Specialty Ins/Munilla Construction Management, is a zero balance account funded directly from the Receiving Account.  The Disbursement Account serves as the vehicle for payment of subcontractors and suppliers on the BHSI Bonded Contracts.

83.    The Berkshire Accounts are all held in the name of Berkshire, through an authorized agent of Berkshire, as account owner. Additionally, pursuant to the Berkshire CMS Agreements, Berkshire has a perfected security interest in each of the Berkshire Accounts, as well as rights in the account balances arising by equitable subrogation and other applicable law.

84.    Maintaining each of the foregoing accounts are a condition to the Debtor obtaining secured, post-petition financing from the Sureties.  Therefore, maintaining the accounts is essential to the Debtor's reorganization

85.    I understand from counsel that section 345 of the Bankruptcy Code and the U.S. Trustee establishes certain requirements with respect to all deposits and investments of money of the estate.  The Debtor believes that the banks at which it maintains its accounts are financially stable banking institutions, are FDIC insured and authorized depository pursuant to 11 U.S.C. § 345(b).  Additionally, as explained above, the Debtor's Bank Accounts comprise an established cash management system that the Debtor needs to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted.  The Debtor will note, in its records, the date and time the chapter 11 petition was filed, and the records will reflect each post-

petition receipt and disbursement. Therefore, a waiver of the section 345 deposit guidelines would not pose a risk to the Debtor's estates nor its creditors.

86.     The Debtor and I have been advised by counsel that the relief requested in the Cash Management Motion has been granted in other large chapter 11 cases in this District.  *See, e.g. In re Goodman and Dominguez, Inc., et al.*, Case No. 17-17237-RAM (Bankr. S.D. Fla. July 7, 2017); *In re Goodman and Dominguez, Inc., et al.*, Case No. 16-10056-RAM (Bankr. S.D. Fla. Feb. 9, 2016); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. May 11, 2015); *In re Florida Gaming Centers, Inc.*, Case No. 13-29597-RAM (Bankr. S.D. Fla. Oct. 7, 2013); *In re TLO, LLC*, Case No. 13-28053-PGH (Bankr. S.D. Fla. June 13, 2013); *In re Ruden McClosky P.A.*, Case No. 11-40603-RBR (Bankr. S.D. Fla. Dec. 5, 2011); *In re Maguire Group Holdings, Inc. et al.*, Case No. 11-39347-RAM (Bankr. S. D. Fla. Oct. 26, 2011); *In re HearUSA, Inc.*, Case No. 11-23341-EPK (Bankr. S.D. Fla. May 16, 2011); *In re Gulfstream International Group, Inc., et al.*, Case No. 10-44131-JKO (Bankr. S.D. Fla. Nov. 8, 2010); *In re Gemini Cargo Logistics, Inc., et al.*, Case No. 08-18173-AJC (Bankr. S.D. Fla. June 20, 2008); *In re Levitt and Sons, LLC*, Case No. 07-19845-RBR (Bankr. S.D. Fla. Nov. 14, 2007); *In re Gemini Cargo Logistics, Inc., et al.*, Case No. 06-10870-AJC (Bankr S.D. Fla. March 17, 2006); *In re Atlas Worldwide Aviation Logistics, Inc. et al.*; Case No. 04-10792-RAM (Bankr. S.D. Fla. Feb. 5, 2004).  Therefore, I submit that the entry of an order authorizing the relief sought will be in the Debtor's best interests and those of its creditors.

**H.     Debtor's Emergency Motion For Order Authorizing it to Honor Contractual Obligations on Bonded Projects, Including Obligations to Materialmen and Subcontractors (the "Bonded Projects Motion").**

87.     The Debtor seeks authority, but not direction, to honor its contractual obligations, including pre-petition obligations, regarding pending bonded Contracts. The Debtor also seeks permission to pay subcontractors and vendors on each of the projects.

88.     The Debtor is a party to bonded contracts pursuant to which it provides construction-related services at sites located in Florida, Texas and in Guantanamo Bay, Cuba. BHSI, as surety, has issued payment and performance bonds with respect to the BHSI Bonded Contracts. Travelers has issued payment and performance bonds with respect to the Travelers Bonded Contracts.

89.     As of the Petition Date, the Debtor owed approximately $1,473,954.42 to its subcontractors and materialmen for work performed on, or material provided to, the BHSI Bonded Contracts.

90.     As of the Petition Date, the Debtor owed approximately $7,851,593.48 to its subcontractors and materialmen for work performed on, or material provided to, the Travelers Bonded Contracts.

91.     In order to facilitate the Debtor's performance of its obligations under the Contracts, and as discussed in the two *Emergency Motions of the Debtor for Interim and Final Orders (I) Authorizing the Debtor (A) to Obtain Post-Petition Financing and (B) to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Modifying the Automatic Stay, (IV) Scheduling Hearing, and (V) Granting Related Relief* (the "DIP Financing Motions") filed contemporaneously herewith, BHSI and Travelers have agreed to provide secured, post-petition financing to the Debtor, upon the terms set for forth in the DIP Financing Motions and the proposed Orders thereon.  Assuming Court approval of the DIP Financing Motions, the Debtor will have sufficient liquidity to complete its performance under the Bonded Contracts.

92.     The work performed by the Debtor and the subcontractors under the Bonded Contracts has been ongoing. The subcontractors are intimately familiar with the Bonded Projects and the work necessary to complete them and, therefore, it would be entirely inefficient, uneconomical and burdensome to the Debtor's estate if replacement subcontractors had to be

31

retained.  Such replacement subcontractors would likely have to spend significant time and resources to "get up to speed" on the respective jobsites, if such subcontractors could be found. Further, to the extent not paid, subcontractors would make claims for payment on the bonds issued by Berkshire and Travelers, as sureties, creating a default under the Contracts and triggering the sureties' rights to payment directly from the counter-parties under principals of subrogation.

93.     I understand from counsel that this Court has the authority to grant the relief requested in the Bonded Project Motion under what is referred to as the "necessity of payment" doctrine, and that relief similar to that requested in the Bonded Project Motion has been granted by at least one other bankruptcy court in this circuit. *See In re WRS Holding Co., et al.*, No. 8:14-bk-08588-CPM (Bankr. M.D. Fla. Aug. 12, 2014) (McEwen, J.). [ECF No. 103]

I.      **Debtor's Emergency Motion for Authorization to Assume Executory Contract Between the Debtor and Ritchie Bros. Auctioneers With Respect to March 2019 Auction of Equipment and Vehicles (the "TX Ritchie Bros. Assumption Motion").**

94.     Through the TX Ritchie Bros. Assumption Motion, the Debtor seeks approval, on an emergency basis, of its assumption of a pre-Petition Date agreement (the "Sales Agreement") with Ritchie Bros. Auctioneers ("Ritchie Brothers") to conduct an auction at its facilities in Texas commencing on March 15, 2019 of certain equipment and vehicles owned by the Debtor which are located in Texas. The Debtor intends to discontinue its operations in Texas and will no longer needs the equipment located in Texas.  In ordinary course of business, the Debtor periodically delivers equipment that it no longer needs to Ritchie Brothers, a market leader in the auction sale of heavy equipment, to be sold at auction.  The Debtor is advised that while Ritchie Bros. conducts auctions throughout the year, it has two well-known signature events that bring in the most prospective purchasers of heavy construction equipment, with the next such auction being conducted in Texas, beginning on March 15, 2019. The Debtor seeks to assume the Sales

8561399

Agreement, in order for the March, 2019 auction to proceed, so that it can maximize the prices it can obtain for the construction equipment and vehicles. On February 15, 2019, Ritchie Brothers commenced its auction of heavy equipment in Florida where the Debtor, with the consent of lessors and lienors on the equipment, sold substantially all of its Florida equipment generating gross sale proceeds of $953,250. The gross proceeds will be reduced by commissions and costs of the auction and the net proceeds will be distributed to the lessors or lienors.

95.     The decision of whether to assume or reject an executory contract or unexpired lease is within the scope of the subject to the "business judgment" test as to which courts show great deference to a debtor's decision. The focus of the Court is on whether assumption or rejection will benefit the bankruptcy estate. I submit that assumption of the Sales Agreement which will facilitate a sale of the equipment and vehicles at the highest possible prices meets the business judgment standard. If the Debtor were not permitted to assume its agreement with Ritchie Bros., it will not be permitted to participate in the March, 2019 auction, will be required to await the next significant equipment auction in Texas (which will not occur until March 2020) and will suffer irreparable harm occasioned by the delay. Accordingly, granting the TX Ritchie Bros. Assumption Motion is in the best interests of the Debtor and its creditors.

**J.      Debtor's Emergency Motion to Reject Executory Contracts and Unexpired Leases, *Nunc Pro Tunc* to the Petition Date (the "Rejection Motion").**

96.     Through the Rejection Motion, the Debtor seeks approval of its rejection of an executory contract and two unexpired leases that are not necessary to the Debtor's post-petition operations and are, therefore, appropriately rejected under Section 365(a) of the Bankruptcy Code to preclude the accrual of unnecessary administrative expenses. Attached to the Rejection Motion as Exhibit "A" is a list of the executory contracts and unexpired leases the Debtor wishes to reject, all regarding business premises in Irving, Texas and Fort Lauderdale, Florida

8561399

previously vacated by the Debtor, an executory contract relating to parking spaces at the Irving, Texas location, and copiers in Irving, Texas that were retrieved by the lessor prior to the Petition Date.

97.     The decision of whether to assume or reject an executory contract or unexpired lease is within the scope of the subject to the "business judgment" test as to which courts show great deference to a debtor's decision. The focus of the Court is on whether assumption or rejection will benefit the bankruptcy estate. I submit that rejection of executory contracts and unexpired leases regarding business premises that have been vacated by the Debtor and copiers retrieved by the lessor easily meet the business judgment standard as rejection will avoid administrative expenses. Moreover, the Debtor does not believe that the contract and leases have any value that can be achieved through an assumption and assignment to a third party. Accordingly, granting the Rejection Motion is in the best interests of the Debtor and its creditors.

**K.     Debtor's Emergency Motion For Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; and (II) Honor Certain Obligations in Respect Thereto (the "<u>Insurance Motion</u>").**

98.     The Debtor filed the Insurance Motion seeking authorization to continue administering insurance policies and agreements relating thereto, and paying certain claims, in the Debtor's discretion to the extent they become due and payable during the pendency of this Chapter 11 Case.

99.     The Debtor maintains Commercial General Liability Insurance; Workers' Compensation and Employers Liability Insurance; Automobile Insurance; Excess Liability Insurance; Property Insurance-Commercial Property Coverage/Inland Marine; Directors and Officers Liability Insurance; Environmental Contractors Pollution Liability/Professional Insurance; Property Insurance-Builder's Risk Coverage; Foreign Casualty Program: Commercial General Liability; Foreign Casualty Program: Business Auto Liability; Foreign Casualty

34

Program: Voluntary Compensation and Employers Liability; Commercial General Liability and Excess Liability Insurance (collectively the "Insurance Policies").

100.    Through two Premium Finance Agreements with AFCO, the Debtor finances the premiums on certain of the Insurance Policies.

101.    It is essential for the Debtor to maintain the Insurance Policies, which provide a comprehensive range of coverage for the Debtor, and continue to pay certain claims, deductibles, self-insured retentions, loss reimbursements and/or loss adjustment expenses, and to continue to pay insurance finance premiums to AFCO, if and to the extent any may become due and payable according to the terms of the Insurance Policies and any premium finance agreements with AFCO. If the Insurance Policies are allowed to lapse, the Debtor will be exposed to substantial liability for any damages resulting to persons or property of the Debtor and others, and the Debtor would have to bear the costs and expenses of defense litigation. Moreover, I understand from counsel that maintenance of the Insurance Policies is mandatory under the guidelines of the U.S. Trustee and various state and federal laws.

102.    The Debtor's continued operations and restructuring efforts require that the Insurance Policies be maintained on an ongoing and uninterrupted basis. In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid for the Insurance Policies are continued and maintained by the Debtor. For example, the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtor's employ. Departures by employees at this critical time may result in a severe disruption of the Debtor's business to the detriment of all parties in interest.

103.    To the extent that the Insurance Policies or the premium finance agreements with AFCO may be deemed executory contracts, the Debtor does not at this time seek authority to

35

assume these contracts. The Debtor only requests authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the Insurance Policies in force. The Debtor and I have been advised by counsel that the relief requested in the Insurance Motion has been granted in other large chapter 11 cases in this District. *See, e.g., In re Goodman and Dominguez, Inc., et al.,* Case No. 17-17237-RAM (Bankr. S.D. Fla. July 7, 2017); *In re Goodman and Dominguez, Inc., et al.*, Case No. 16-10056-RAM (Bankr. S.D. Fla. Jan. 1, 2016); *In re Star Computer Group, Inc.,* Case No. 15-28100-AJC (Bankr. S.D. Fla. Nov. 6, 2015); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. April 21, 2015); *In re Ruden McClosky, P.A.*, Case No. 11-40603-RBR (Bankr. S.D. Fla. Dec. 5, 2011); *In re Maguire Group Holdings, Inc. et al.,* Case No. 11-39347-RAM (Bankr. S.D. Fla. Nov. 30, 2011); *In re HearUSA, Inc.,* Case No. 11-23341-EPK (Bankr. S.D. Fla. May 20, 2011); *In re Gulfstream Intern. Group, Inc., et al.,* Case No. 10-44131-JKO (Bankr. S.D. Fla. Nov. 8, 2010); *In re DM Indus., Ltd.*, Case No. 09-15533-LMI (Bankr. S.D. Fla. April 10, 2009).  Therefore, I submit that the entry of an order authorizing the relief sought will be in the Debtor's best interests and those of its creditors.

**L.     Emergency Motion for Emergency Motion for Interim and Final Orders (i) Authorizing Debtor (a) to Obtain Postpetition Financing from Travelers; and (b) to Utilize Cash Collateral, (ii) Granting Adequate Protection, (iii) Modifying the Automatic Stay, (iv) Scheduling Final Hearing; and (v) Granting Related Relief (the "Travelers DIP Financing Motion")**

104.     Through the Travelers  DIP Financing Motion, the Debtor primarily seeks post-Petition Date debtor-in-possession financing from Travelers sufficient to complete the projects associated with the Travelers Bonded Contracts, that is, to satisfy payments due to subcontractors and suppliers under the Travelers Bonded Contracts, direct and indirect labor costs incurred in performance of the Travelers Bonded Contracts, and an agreed-upon percentage of overhead according to the Budget. The post-Petition Date financing will also be

used to satisfy certain fees and expenses of professionals retained by the Debtor and creditor's committee up to an amount set forth in the Budget.

105.    The Debtor seeks debtor-in-possession financing up to $3,400,000 on an interim basis on the terms and conditions set forth in the Travelers DIP Financing Motion, and as more specifically provided for in the Loan and Security Agreement attached to the motion. At the final hearing on the motion, the Debtor will seek authorization to obtain DIP financing on a final basis of up to $16,800,000, inclusive of the $3,400,000 amount sought on an interim basis. For the reasons explained in the Travelers DIP Financing Motion, I understand that the relief requested is appropriately granted under Section 364 of the Bankruptcy Code.

106.    A central component of the Debtor's proposed financial restructuring is its completion of the projects associated with the Travelers Bonded Contracts. The requested debtor-in-possession financing will facilitate the completion of those projects which is in the best interest of the Debtor, its estate and creditors.

**M.    Emergency Motion for Emergency Motion for Interim and Final Orders (i) Authorizing Debtor (a) to Obtain Postpetition Financing from Travelers; and (b) to Utilize Cash Collateral, (ii) Granting Adequate Protection, (iii) Modifying the Automatic Stay, (iv) Scheduling Final Hearing; and (v) Granting Related Relief (the "BSHI DIP Financing Motion")**

107.    Through the BHSI DIP Financing Motion, the Debtor primarily seeks post-Petition Date debtor-in-possession financing from Travelers sufficient to complete the projects associated with the BHSI Bonded Contracts, that is, to satisfy payments due to subcontractors and suppliers under the BHSI Bonded Contracts, direct and indirect labor costs incurred in performance of the BHSI Bonded Contracts, and an agreed-upon  percentage of overhead according to the Budget. The post-Petition Date financing will also be used to satisfy certain fees and expenses of professionals retained by the Debtor and creditor's committee up to an amount set forth in the Budget.

37

108.    The Debtor seeks debtor-in-possession financing up to $1,200,000 on an interim basis on the terms and conditions set forth in the BHSI DIP Financing Motion, and as more specifically provided for in the Loan and Security Agreement attached to the motion. At the final hearing on the motion, the Debtor will seek authorization to obtain DIP financing on a final basis of up to $3,000,000, inclusive of the $1,200,000 amount sought on an interim basis. For the reasons explained in the BHSI DIP Financing Motion, I understand that the relief requested is appropriately granted under Section 364 of the Bankruptcy Code.

109.    A central component of the Debtor's proposed financial restructuring is its completion of the projects associated with the BHSI Bonded Contracts. The requested debtor-in-possession financing will facilitate the completion of those projects which is in the best interest of the Debtor, its estate and creditors.

O.    **Debtor's Emergency Motion for Order Authorizing and Approving Post-Petition Credit Card Financing Agreement With Bank of America, N.A. (the "Credit Card Financing Motion")**

110.    Through the Credit Card Financing Motion, the Debtor requests that it be authorized to obtain post-petition financing in the form of a credit card facility provided by Bank of America, N.A., up to the amount of $65,000 upon the terms set forth in the Security Agreement (the "Credit Card Facility") attached to the Credit Card Financing Motion as Exhibit "A". Pursuant to the Security Agreement, Bank of America, N.A. will finance business-related charges on the same terms it provided prior to the Petition Date.  Because the Debtor's employees need to use the credit cards for travel, equipment rentals and other business-related expenses, access to the Credit Card Facility and the continued use of the credit cards is essential to the Debtor's business operations.

111.    To secure payment of amounts due under the Security Agreement, Travelers and Berkshire funded $65,000.00 into the Debtor's demand deposit account ending in 4183 at Bank

of America, N.A. (the "Collateral Account") and the Debtor executed a Security Agreement dated November 13, 2018 (the "Security Agreement") granting Bank of America, N.A. a security interest in the Collateral Account.   The Security Agreement also provided that the funds in the account to be held in trust for the benefit of Travelers and Berkshire subject only to the security interest of Bank of America, N.A.

112.    As a condition to entering into the Security Agreement, Bank of America, N.A. requires the Debtor to obtain an Order of this Court specifically providing for the following:

a.    The Debtor is authorized to perform its obligations under the Security Agreement and ratify the grant of the security interest to Bank of America, N.A. in the BofA Cash Collateral.

b.    Upon the Debtor's default on any payment due and owing under the Security Agreement, the automatic stay provisions of 11 U.S.C. § 362 shall be immediately lifted, and Bank of America, N.A. may, after giving notice required by applicable state law and pursuant to the Security Agreement, including to Travelers and BHSI through their respective counsel, apply the Cash Collateral to satisfy amounts due and owing to Bank of America, N.A.

c.    If following default the BofA Cash Collateral is insufficient to pay the total amount due to Bank of America, N.A. under the Security Agreement, then any remaining amount owing to Bank of America, N.A. on account of post-petition advances made by Bank of America, N.A. under the Credit Card Facility, including its reasonable attorneys' fee, shall be allowed as an administrative expense of the estate pursuant to Code § 503.

113.    Given the need for the Credit Card Facility, the Debtor submits that the relief requested is appropriately authorized, and that relief is in the best interest of the Debtor, the estate and its creditors.

8561399

**P.      Debtor's Emergency Motion for Order (i) Granting Adequate Protection to Travelers; (ii) Modifying the Automatic Stay; (iii) Scheduling Final Hearing; and (iv) Granting Related Relief (the "<u>Travelers Adequate Protection Motion</u>").**

114.    Through the Travelers Adequate Protection Motion, the Debtor seeks entry of interim and final orders: (i) approving the form of adequate protection to be provided by the Debtor to Travelers for the use of the equipment used by the Debtor on the E4S38 A1A Bridge Improvements project (the "<u>A1A Project</u>").  The Debtor is utilizing owned equipment (the "<u>A1A Equipment Collateral</u>") and leased equipment to complete its work on the A1A Project.  The A1A Equipment Collateral is part of the Debtor's owned equipment.  Berkshire issued a payment and performance bond on the A1A Project for the benefit of the Florida Department of Transportation and other obligees.

115.    The continued use of the A1A Equipment Collateral on the A1A Project will result in a decline in the value of the A1A Equipment Collateral.  Thus, the Debtor requests authority to grant the following adequate protection in favor of Travelers for the use of the A1A Equipment Collateral until the earlier of (x) completion of the A1A Project, or (y) the A1A Termination Date, as follows:

(i)      Monthly adequate protection payments of $13,900.00 to be paid on the first day of each calendar month;

(ii)     At Debtor and Berkshire's sole cost and expense, maintenance of insurance on the A1A Equipment Collateral with Travelers as a named insured on such policy and with Berkshire and the Debtor to cover any deductibles related to such insurance in the event of a claim; and

(iii)    At Debtor and Berkshire's sole cost and expense, maintenance of the A1A Equipment Collateral in accordance with applicable manufacturer's recommendations and repair of all A1A Equipment Collateral as necessary to maintain the A1A Equipment

40

Collateral in the same working condition as of the Petition Date.

116.     The foregoing adequate protection obligations shall continue to be charged as direct expenses of the A1A Project.  The agreed upon adequate protection payments will be made by the Debtor from the proceeds of the DIP loan to be provided by Berkshire to the Debtor. Approval of the requested adequate protection is a condition precedent to the DIP financing that Travelers is to be providing which adequate protection will compensate Travelers for the diminution in the value of the A1A Equipment Collateral.  Providing adequate protection will facilitate the Debtor completing the A1A Project, and is therefore in the best interests of the Debtor and the estate.

### III.    DEBTOR'S OBJECTIVES IN THIS CASE

117.     The Debtor commenced this case to stabilize its remaining operations, access the liquidity to be provided under the debtor-in-possession financing arrangements, restructure its balance sheet and preserve the opportunity to restore operations following completion of the NTSB investigation and provide a forum for the efficient resolution of contingent and unliquidated claims.  Through the motions described above and other motions the Debtor intends to file shortly after the Petition Date, the Debtor hopes to minimize any adverse effects that this Chapter 11 Case might otherwise have on its business and stakeholders.  I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

### 28 U.S.C.  § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

8561399

Executed this 1st day of March, 2019 in Miami, Florida.

Gilberto Ruizcalderon, Chief Financial Officer
of Magnum Construction Management, LLC
f/k/a Munilla Construction Management, LLC

8561399