UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Case

MAGNUM CONSTRUCTION MANAGEMENT,            Case No.: 19-12821-AJC
LLC f/k/a Munilla Construction Management, LLC, [1]

     Debtor.
_____/

**DEBTOR'S MOTION TO (A) APPROVE COMPROMISE AND SETTLEMENT
AGREEMENT; (B) AUTHORIZE AND DIRECT THE DEBTOR TO ENTER INTO AND
PERFORM UNDER SETTLEMENT AGREEMENT; (C) ENJOIN CERTAIN CLAIMS
AGAINST CERTAIN INSURERS; AND (D) GRANT RELATED RELIEF**

Magnum Construction Management, LLC f/k/a Munilla Construction Management, LLC

("MCM" or the "Debtor"), by undersigned counsel, moves the Court, pursuant sections 105(a)

and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and to Rules 2002(a),

6004(a), 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

for entry of an Order in the form of that attached hereto as **Exhibit B** (the "Settlement Approval

Order"[2]) (a) approving the compromise and settlement agreement between the Debtor, on the one

hand, and Greenwich Insurance Company ("GIC"), XL Insurance America, Inc. ("XLIA"),

Indian Harbor Insurance Company ("IHIC" and, collectively with GIC  XLIA, "XL") and

The Ohio Casualty Insurance Company ("Ohio Casualty" and, with XL, the "Insurers" and,

collectively with MCM, the "Parties"), on the other hand (the "Settlement Agreement"), by

which the Parties agree to resolve any and all Claims arising out of or relating to or in any way

involving the Bridge Collapse, the Bridge Collapse Bodily Injury Claims, or the Bridge Collapse

---

[1]  The Debtor's address is 6201 SW 70th Street, 1st Floor, Miami, FL 33143.  The last four digits of the Debtor's
federal tax identification number are 3403.
[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Settlement Agreement, a copy of which is attached hereto as **Exhibit A**.

Other Damage Claims by the Insurers' agreement to pay the Applicable Policy Limit of the Insurance Policies, thereby fully and completely exhausting the Policy Limits and extinguishing each Insurer's obligations under the Insurance Policies (except for the GIC Policy Exception), in consideration of the Debtor's agreement to fully and completely release each Insurer from any and all Claims arising out of or relating to or in any way involving the Bridge Collapse, the Bridge Collapse Bodily Injury Claims, the Bridge Collapse Other Damage Claims, or the Insurance Policies (subject to the GIC Policy Exception), and to use its best efforts to confirm the Plan of Reorganization, (b) authorizing and directing the Debtor to enter into and perform the Settlement Agreement, (c) enjoining the Claims against the Insurers, and (d) granting related relief. In support of this Motion, the Debtor states:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought in herein are sections 105(a) and 363(b) of the Bankruptcy Code and Rules 2002(a), 6004(a), 9014, and 9019(a) of the Bankruptcy Rules.

**Background**

5.      On March 1, 2019 (the "Petition Date"), the Debtor commenced this case (the "Bankruptcy Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. [ECF No. 1].

2

6.      The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      For a detailed description of the Debtor, its assets, liabilities and history, the Debtor respectfully refers the Court and parties in interest to the *Declaration of Debtor's Chief Financial Officer in Support of First Day Pleadings* (the "First Day Declaration")[ECF No. 8]

8.      On March 14, 2019, the Office of the United States Trustee appointed an official committee of unsecured creditors in the Debtor's chapter 11 case (the "Committee"). [ECF No. 109]

9.      As described in more detail in the First Day Declaration, the Debtor was the contractor on the FIU Pedestrian Bridge that collapsed on March 15, 2018.  As of the Petition Date, the Debtor was a defendant in 18 lawsuits filed in Miami-Dade Circuit Court alleging personal injuries or wrongful death arising from the accident.  Since the Petition Date, two additional lawsuits have been filed alleging personal injuries arising from the accident, although the Debtor has not been named as a party in those additional lawsuits given the imposition of the automatic stay.

10.      MCM is an insured under the following insurance policies issued by XL:  GIC Policy No. CGS740951901 (the "GIC Policy"); XLIA Policy No. US00072885LI17A (the "XLIA Policy"); and IHIC Policy No. CEO744659901 (the "IHIC Policy" and, with the GIC Policy and the XLIA Policy, the "XL Policies").  MCM also is an insured under the following insurance policy issued by Ohio Casualty:  Excess Liability Policy No. ECO (18)58267898 (the "Excess Liability Policy").

11.      The limits of liability of the Insurance Policies are as follows:  GIC Policy - $2 million (each occurrence)/$4 million (aggregate); XLIA Policy - $25 million (each

occurrence)/$25 million (aggregate); IHIC Policy - $5 million (each claim)/$5 million (aggregate) and subject to a $50,000 self-insured retention; and Excess Liability Policy - $10 million (each occurrence)/$10 million (aggregate).

12.     Subject to a reservation of rights, GIC has provided the Debtor with a defense in litigation arising out of the Bridge Collapse that has been brought against the Debtor, and others.

13.     IHIC, XLIA, and Ohio Casualty have reserved the right to deny coverage to the Debtor under their respective Insurance Policies to the extent that any of their respective Insurance Policies do not provide coverage for any claim asserted against the Debtor in the litigation arising out of the Bridge Collapse.

14.     As described in more detail in the First Day Declaration, the Debtor and the Insurers have been engaged in good-faith negotiations regarding the Insurers' contribution of the Applicable Policy Limit of $42,000,000 to enable the Debtor to establish a settlement trust or fund that the Debtor believes will enable it to fully resolve all claims asserted against it relating to the Bridge Collapse.   These negotiations culminated on April 29, 2019 with the Parties' execution of the Settlement Agreement.

15.     The principal terms of the Settlement Agreement are as follows:[3]

    a)    Subject to the terms and conditions of the Settlement Agreement, the Insurers shall pay the Applicable Policy Limit of $42,000,000 to MCM in full and final exhaustion of the Policy Limits and extinguishment of each Insurer's obligations under the Insurance Policies, subject to the GIC Policy Exception;

    b)    The Insurers shall pay the Applicable Policy Limit to MCM not later than 10 days after the Settlement Approval Order becomes a Final Order;

---

[3] This description of the principal terms of the Settlement Agreement is a summary provided for the convenience of the Court and parties in interest, which is not intended to, and shall not, amend, alter, or supplant the terms of the Settlement Agreement.  Reference is made to the Settlement Agreement itself for all of the terms and conditions thereof.

4

c)       Until the Plan of Reorganization is confirmed, the Confirmation Order becomes a Final Order, and the Applicable Policy Limit is transferred to the Bridge Collapse Bodily Injury Claims Trust or any portion of the Applicable Policy Limit is transferred to the Other Damage Claim Fund to the extent required by this Court or another court having jurisdiction with respect thereto as contemplated by the Settlement Agreement, MCM shall hold the Applicable Policy Limit in the trust account of its counsel for the benefit of holders of Bridge Collapse Bodily Injury Claims and Bridge Collapse Other Damage Claims (subject to the Insurers' rights under Section 6.2 of the Settlement Agreement) and shall not commingle the Applicable Policy Limit with any other assets of the Estate;

d)       The Parties agree that, subject to the GIC Policy Exception: (i) the Applicable Policy Limit is the maximum amount the Insurers are obligated to pay on account of any and all Claims of any kind made under or related to the Insurance Policies arising from the Bridge Collapse or otherwise; and (ii) the Applicable Policy Limit is equal to or greater than the fair value of MCM's interests in the Insurance Policies. The Parties further agree that, subject to the GIC Policy Exception and to the entry of the Approval Orders: (i) under no circumstance will the Insurers ever be obligated to make any additional payments to MCM or the Estate or any other Person or entity under the Insurance Policies; (ii) all limits of liability of the Insurance Policies, including all per occurrence and aggregate limits, are and shall be deemed to be fully and properly exhausted; and, (iii) except for GIC's obligation to defend the Debtor as contemplated by the Settlement Agreement, all obligations of the Insurers under the Insurance Policies are and shall be deemed to be extinguished;

e)       MCM represents and warrants that the Applicable Policy Limit is the maximum amount that the Insurers shall be obligated to pay with respect to all Claims and that MCM has not at any time on or after March 15, 2018, without the consent of the Insurers, entered into, and shall not henceforth enter into, any settlements of any Claims pursuant to which the Insurers may be obligated to pay any amounts under the Insurance Policies; provided, however, that nothing in the Settlement Agreement shall bar or prohibit MCM from making distributions to the holders of allowed Claims under and pursuant to the Plan of Reorganization;

f)       MCM agrees that, subject to the GIC Policy Exception, from and after May 31, 2019: (i) all of MCM's outstanding tenders to the Insurers for defense and/or indemnity of any Claims shall be deemed withdrawn; (ii) MCM shall not tender to the Insurers any Claims; (iii) MCM will not request that the Insurers fund any judgments or settlements of any Claims; and (iv) the Insurers shall have no obligation to pay, handle, object to, or otherwise respond to any Claims. Nothing in the Settlement Agreement shall bar or prohibit MCM from tendering any Non-Bridge Collapse

5

Claims to GIC or from tendering any claims to the Insurers under any policy of insurance other than one of the Insurance Policies;

g)    MCM and GIC agree that GIC's duty to defend MCM in the Bridge Collapse Bodily Injury Claims and the Bridge Collapse Other Damage Claims pursuant to the GIC Policy shall terminate on the Approval Date or such earlier time as all holders of Bridge Collapse Bodily Injury Claims and holders of Bridge Collapse Other Damage Claims release such claims against MCM;

h)    MCM and the Insurers agree that nothing in the Settlement Agreement is intended to be or shall be construed as a waiver of MCM's rights as an additional insured under any policy of insurance other than the Insurance Policies which rights shall be retained by MCM and its bankruptcy estate, or as a waiver of any of MCM's rights as an additional insured that have been assumed by the Insurers or to which the Insurers are subrogated as a matter of law or equity;

i)    MCM and the Insurers agree that nothing in the Settlement Agreement is intended to be or shall be construed as a waiver of any Party's rights or obligations under the *Order Granting Debtor's Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Continue Certain Premium Financing Arrangements Relating Thereto; and (III) Honor Certain Obligations In respect Thereof* (ECF No. 78);

j)    MCM and GIC agree that, notwithstanding payment of the Applicable Policy Limit pursuant to the Settlement Agreement, holders of Non-Bridge Collapse Claims shall be permitted, pursuant to the Plan Confirmation Order, to pursue such claims solely to the extent of the applicable policy limits of the GIC Policy, subject to all of the terms, conditions, exclusions and limitations thereof; and

k)    Subject to the provisions of Section 6.2 of the Settlement Agreement (which concern the potential that the Bankruptcy Court does not approve the Settlement Agreement, the Settlement Approval Order does not become a Final Order by the date specified, the Bankruptcy Court does not confirm the Plan of Reorganization, the Plan Confirmation Order does not become a Final Order by the deadline specified, or the Approval Orders are vacated or modified or reversed on appeal such that they do not become Final Orders) MCM, on behalf of itself and the Estate, shall release the Insurers and the other Released Parties from any and all Claims, subject to the GIC Policy Exception, which release shall include, but not be limited to, any and all Claims for coverage under the Insurance Policies arising out of or relating to or in any way involving the Bridge Collapse, whether for wrongful death, personal injury, emotional distress,

property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Insurance Policies. In addition, MCM, on behalf of itself and the Estate, withdraws any requests, demands, or tenders for defense or indemnity previously submitted to the Insurers under the Insurance Policies arising out of or relating to or in any way involving the Bridge Collapse, and further surrenders, relinquishes, and releases any further right to tender or present Claims whatsoever to the Insurers under the Insurance Policies.  Furthermore, by virtue of the foregoing releases and the Approval Orders, subject to the GIC Policy Exception, the Insurers shall have no duty to defend or indemnify MCM, on behalf of itself and the Estate, or any other insured under the Insurance Policies with respect to any past, present, or future Claim, nor shall the Insurers have any other duty or obligation whatsoever to any other Person or entity with respect to any and all Claims.

### Relief Requested and Basis Therefor

16.    Bankruptcy Rule 9019(a) provides that on motion and after notice and a hearing, a court may approve a proposed compromise or settlement.  The decision of whether or not to approve a compromise is within the sound discretion of the court. *In re Carson*, 82 B.R. 847 (Bankr. S.D. Ohio 1987); *In re Mobile Air Drilling Co.*, 53 B.R. 605 (Bankr. N.D. Ohio 1985).

17.    In passing on proposed settlements, the standard that courts applied under the former Bankruptcy Act is the same standard as courts should apply under the Bankruptcy Code. *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984).  As stated by the United States Supreme Court in *Protective Committee v. Anderson*, 300 U.S. 414 (1968), under the Act, to approve a proposed settlement, a court must find that the settlement was "fair and equitable" based on an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *Protective Committee*, 300 U.S. at 424.

9049303-3

18.     This test was adopted by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990), which provides additional guidance as to whether a compromise should be approved. *Justice Oaks* established a four-part test for approval:

(a)     The probability of success in litigation;

(b)     The difficulties, if any, to be encountered in the matter of collection;

(c)     The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and

(d)     The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

19.     The Settlement Agreement is an important, and perhaps essential, element of the Debtor's proposed restructuring.  As described in more detail in the First Day Declaration, the Debtor commenced this Bankruptcy Case, in large part, to establish an orderly, fair, and expeditious process to resolve the Debtor's potential liabilities resulting from the Bridge Collapse.  The Settlement Agreement advances that goal by, among other things, providing the estate with $42 million in cash that will be used exclusively for the benefit of the holders of Bridge Collapse Bodily Injury Claims or Bridge Collapse Other Claims. The Settlement Agreement resolves all of the disputes or controversies regarding coverage available to the Debtor under the Insurance Policies; and, the resolution is very favorable for the Debtor in that all applicable proceeds of the Insurance Policies will be made available to the Debtor's estate.

20.     The issues raised in the pending lawsuits are complex.  While GIC has provided the Debtor a defense, it has done so under a reservation of rights.  In addition, IHIC, XLIA, and Ohio Casualty have reserved the right to deny coverage to the Debtor under their respective Insurance Policies to the extent that any of their respective Insurance Policies do not provide

coverage for any claim asserted against the Debtor in the litigation arising out of the Bridge Collapse.  The Settlement Agreement also obviates any disputes regarding coverage available to the Debtor under the Insurance Policies.

21.    The Debtor is mindful of the additional administrative expenses that will be incurred in the event that the Settlement Agreement is not approved.  The Parties believe that resolution of the Debtor's rights under the Insurance Policies as set forth in the Settlement Agreement is reasonable and falls well above the lowest point in the range of reasonableness as required by Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable law.

22.    The Debtor submits that the Settlement Agreement is in the best interest of the estate and its creditors.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order, substantially in the form attached hereto as **Exhibit B**, (a) granting this Motion; (b) approving the Settlement Agreement; and (c) granting such other and further relief as the Court deems just and proper.

Dated: April 30, 2019                    Respectfully submitted,

                                         BERGER SINGERMAN, LLP
                                         *Counsel for Debtor and Debtor-in-Possession*
                                         1450 Brickell Avenue, Ste. 1900
                                         Miami, FL  33131
                                         Telephone: (305) 755-9500
                                         Facsimile: (305) 714-4340

                                         By:   */s/ Jordi Guso*
                                               Jordi Guso
                                               Florida Bar No. 863580
                                               jguso@bergersingerman.com
                                               Paul A. Avron
                                               Florida Bar No. 50814
                                               pavron@bergersingerman.com

9

9049303-3

# EXHIBIT "A"

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made as of the Execution Date between and among Magnum Construction Management, LLC, f/k/a Munilla Construction Management LLC, as debtor and debtor-in-possession ("MCM"), on the one hand, and Greenwich Insurance Company, XL Insurance America, Inc., Indian Harbor Insurance Company (individually, "GIC," "XLIA" and "IHIC" and, collectively, "XL") and The Ohio Casualty Insurance Company ("Ohio Casualty" and, collectively with XL, the "Insurers"), on the other hand, and shall be effective as of the Approval Date.

## RECITALS

WHEREAS, MCM is an insured under the following insurance policies issued by XL: GIC Policy No. CGS740951901 (the "GIC Policy"); XLIA Policy No. US00072885LI17A (the "XLIA Policy"); and IHIC Policy No. CEO744659901 (the "IHIC Policy" and, with the GIC Policy and the XLIA Policy, the "XL Policies");

WHEREAS, MCM also is an insured under the following insurance policy issued by Ohio Casualty:  Excess Liability Policy No. ECO (18)58267898 (the "Excess Liability Policy");

WHEREAS, the limits of liability of the Insurance Policies (the "Policy Limits") are as follows:  GIC Policy - $2 million (each occurrence)/$4 million (aggregate); XLIA Policy - $25 million (each occurrence)/$25 million (aggregate); IHIC Policy - $5 million (each claim)/$5 million (aggregate) and subject to a $50,000 self-insured retention; and Excess Liability Policy - $10 million (each occurrence)/$10 million (aggregate);

WHEREAS, on March 15, 2018, the FIU pedestrian bridge collapse (the "Bridge Collapse") occurred, causing fatalities, bodily injuries and property damage;

WHEREAS, numerous claims arising out of the Bridge Collapse have been asserted against MCM and others;

{34266: 021: 02582044.DOCX :6 }

WHEREAS, claims that do not arise out of the Bridge Collapse have been asserted against MCM, which claims may be covered by the Insurance Policies;

WHEREAS, subject to a reservation of rights, GIC has provided MCM with a defense in litigation arising out of the Bridge Collapse that has been brought against MCM, and others;

WHEREAS, on March 1, 2019 (the "Petition Date"), MCM filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), thereby commencing the Bankruptcy Case;

WHEREAS, the Parties wish to resolve any and all Claims arising out of or relating to or in any way involving the Bridge Collapse, the Bridge Collapse Bodily Injury Claims, or the Bridge Collapse Other Damage Claims by entering into this Agreement pursuant to which the Insurers agree to pay the Applicable Policy Limit of the Insurance Policies, thereby fully and completely exhausting the Policy Limits and extinguishing each Insurer's obligations under the Insurance Policies, except for the GIC Policy Exception, in consideration of MCM's agreement to fully and completely release each Insurer from any and all Claims arising out of or relating to or in any way involving the Bridge Collapse, the Bridge Collapse Bodily Injury Claims, the Bridge Collapse Other Damage Claims, or the Insurance Policies, and to use its best efforts to confirm the Plan of Reorganization in the Bankruptcy Case;

WHEREAS, the Parties intend that this Agreement be approved by the Bankruptcy Court pursuant to the Settlement Approval Order approving the Settlement Motion and pursuant to the Plan Confirmation Order approving the Plan of Reorganization;

WHEREAS, pursuant to this Agreement, the Plan of Reorganization, and the Approval Orders, the Parties seek to provide the Insurers and their respective officers, directors,

employees, agents, attorneys, representatives, affiliates, reinsurers and associated third parties (the "Released Parties") with the broadest possible releases of Claims arising out of or relating to or in any way involving Bridge Collapse, the Bridge Collapse Bodily Injury Claims, the Bridge Collapse Other Damage Claims, or the Insurance Policies, and to enjoin all Persons and entities, including without limitation holders of Bridge Collapse Bodily Injury Claims, holders of Bridge Collapse Other Damage Claims, the trustee of the Bridge Collapse Bodily Injury Claims Trust, and other insurers of MCM, from suing on or otherwise pursuing any Insurer or any other Released Party for any and all released Claims.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties agree as follows:

I.    DEFINITIONS

As used in this Agreement, the following terms have the meanings set forth below.

1.1    "Agreement" shall have the meaning given in the preamble.

1.2    "Applicable Policy Limit" means $42,000,000, consisting of: (a) $2,000,000 under the GIC Policy for Claims arising from the Bridge Collapse, subject to a $10,000 per occurrence deductible which deductible has been satisfied by MCM; (b) $25,000,000 under the XLIA Policy; (d) $5,000,000, subject to a $50,000 self-insured retention, under the IHIC Policy; and (e) $10,000,000 under the Excess Liability Policy.

1.3    "Approval Date" means the date on which the Approval Orders become Final Orders. If the Settlement Approval Order and the Plan Confirmation Order become Final Orders on different dates, the Approval Date means the date on which the later order to become a Final Order becomes a Final Order.

1.4    "Approval Orders" means the Settlement Approval Order and the Plan Confirmation Order.

1.5    "Bankruptcy Case" means the case styled *In re Magnum Construction Management, LLC, f/k/a Munilla Construction Management, LLC*, Case No. 19-12821 (Bankr. S.D. Fla.).

1.6    "Bankruptcy Code" shall have the meaning given in the Recitals.

1.7    "Bankruptcy Court" shall have the meaning given in the Recitals.

1.8    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.9    "Bridge Collapse" shall have the meaning given in the Recitals.

1.10    "Bridge Collapse Bodily Injury Claims" means all bodily injury, including wrongful death, tort claims arising out of or relating to the Bridge Collapse, including but not limited to the currently known Bridge Collapse Bodily Injury Claims identified in Schedule A attached hereto, but excluding Bridge Collapse Other Damage Claims.

1.11    "Bridge Collapse Bodily Injury Claims Trust" means the trust established by the Plan of Reorganization for the benefit of holders of allowed Bridge Collapse Bodily Injury Claims and approved by the Plan Confirmation Order, in form and substance reasonably acceptable to the Insurers, that, among other things: (i) establishes a process for resolving and making distributions to holders of allowed Bridge Collapse Bodily Injury Claims from trust assets; and (ii) requires holders of Bridge Collapse Bodily Injury Claims to execute a supplemental release of any and all Claims against the Insurers in consideration of and as a condition to receiving a distribution from the trust.

1.12    "Bridge Collapse Other Damage Claims" means all claims for any other damage arising out of or relating to the Bridge Collapse, but excluding Bridge Collapse Bodily Injury Claims.

1.13    "Claim" means past, present and future claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual or otherwise, whether statutory, at common law or in equity, including but not limited to claims for breach of contract, breach of the implied covenant of good faith and fair dealing, bad faith, unfair claim settlement practices, statutory or regulatory violations, for indemnity or contribution, or punitive, exemplary or extra-contractual damages of any type, including, without limitation, but subject to the GIC Policy Exception, all Claims:  (i) arising out of or relating to or in any way involving, in whole or in part, directly or indirectly, whether through a direct claim, cross-claim, third-party claim, subrogation claim, class action or otherwise, (a) the Bridge Collapse, the Bridge Collapse Bodily Injury Claims, or the Bridge Collapse Other Damage Claims, including without limitation any and all claims for wrongful death, personal injury, emotional distress, property damage, economic loss, or environmental damage, remediation or exposure, or (b) the Insurance Policies, including without limitation the issuance of the Insurance Policies, the coverage under the Insurance Policies, the defense of litigation arising out of the Bridge Collapse, or any act or omission of any Insurer of any type for which a Claimant might seek relief in connection with the Insurance Policies; or (ii) that would otherwise constitute a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.14    "Claimant" means any Person or entity holding or potentially holding any Claim against the Insurers or any other Released Parties.

1.15    "Estate" means the MCM bankruptcy estate.

1.16    "Excess Liability Policy" shall have the meaning given in the Recitals.

1.17    "Execution Date" means the date on which this Agreement has been executed by all Parties hereto.

1.18    "FDOT" means the Florida Department of Transportation, and any of its officers, agents, employees and successors.

1.19    "Final Order" means an order of the Bankruptcy Court that is no longer subject to further appeals, either because the time to appeal has expired without an appeal being filed or because it has been affirmed by any and all courts with jurisdiction to consider any appeals therefrom.

1.20    "FIU" means Florida International University, the Florida International University Board of Trustees, and the agents, officers, employees and successors of each of the foregoing.

1.21    "GIC Policy Exception" means any obligation of GIC under the GIC Policy to provide a defense to MCM in connection with the Bridge Collapse Bodily Injury Claims or the Bridge Collapse Other Damage Claims and any obligation of GIC to provide coverage to MCM for the Non-Bridge Collapse Claims.

1.22    "Injunction" means one or more orders of the Bankruptcy Court, which shall include the Settlement Approval Order and the Plan Confirmation Order and which may include a separate order of the Bankruptcy Court, permanently releasing and enjoining the enforcement, prosecution, continuation or commencement of any Claim that any Person or entity holds or asserts or may in the future hold or assert against an Insurer or any other Released Party.  The

Injunction shall provide that all Claimants, whether or not consensually, shall be deemed to have granted full and complete releases to the Insurers and the other Released Parties and shall be permanently and forever barred, estopped, stayed and enjoined from: (i) pursuing any Claim against the Insurers or the other Released Parties; (ii) continuing or commencing any action or other proceeding with respect to any Claim against the Insurers or the other Released Parties; (iii) seeking the enforcement, attachment, collection or recovery of any judgment, award, decree, or order against the Insurers or the other Released Parties or any property of the Insurers or the other Released Parties with respect to any Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Insurers or the other Released Parties or any property of the Insurers or the other Released Parties with respect to any Claim; and/or (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Insurers or the other Released Parties with respect to any Claim.

1.23    "Insurance Policies" shall mean the XL Policies and the Excess Liability Policy pursuant to the meaning given to those terms in the Recitals.

1.24    "Insurers" shall have the meaning given in the preamble.

1.25    "MCM" shall have the meaning given in the preamble.

1.26    "Non-Bridge Collapse Claims" means any claim against MCM for which any of the Insurance Policies provide insurance coverage to MCM and that is not related to and does not arise from the Bridge Collapse.

1.27    "Ohio Casualty" shall have the meaning given in the preamble.

1.28    "Other Damage Claim Fund" means a fund, to be held in trust by MCM, as debtor and debtor in possession or reorganized debtor, as applicable, for the exclusive benefit of the holders of allowed Bridge Collapse Other Damage Claims, which shall be funded with such

portion of the policy limits of the IHIC Policy as hereafter may be determined by the Bankruptcy Court or other court having jurisdiction with respect thereto.

1.29    "Parties" means MCM, XL, and Ohio Casualty.

1.30    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or limited partnership, a proprietorship, joint venture, trust, legal representative, or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.31    "Petition Date" shall have the meaning given in the Recitals.

1.32    "Plan Confirmation Order" means a Final Order of the Bankruptcy Court entered in the Bankruptcy Case, in form and substance reasonably satisfactory to the Insurers, that confirms the Plan of Reorganization.

1.33    "Plan of Reorganization" means the chapter 11 plan of reorganization to be filed by MCM in the Bankruptcy Case, in form and substance reasonably acceptable to the Insurers (insofar as it relates to or in any way involves the Bridge Collapse, the Bridge Collapse Bodily Injury Claims, the Bridge Collapse Other Damage Claims, the Insurance Policies, the Policy Limits, the Bridge Collapse Bodily Injury Claims Trust, or the Other Damage Claim Fund) that, among other things:  (i) contains the terms of the Agreement; (ii) incorporates the terms of the Settlement Approval Order; (iii) provides for each Insurer's payment of its Applicable Policy Limit to exhaust the limits of coverage available under the Insurance Policies and extinguish the Insurers' obligations thereunder, subject to the GIC Policy Exception; (iv) establishes the Bridge

Collapse Bodily Injury Claims Trust for the benefit of holders of Bridge Collapse Bodily Injury Claims; (v) provides that the Insurers' payments pursuant to the Agreement shall be paid to the Bridge Collapse Bodily Injury Claims Trust; (vi) provides for the establishment, funding and administration of the Other Damage Claim Fund; (vii) channels (a) the Bridge Collapse Bodily Injury Claims to the Bridge Collapse Bodily Injury Claims Trust and (b) the Bridge Collapse Other Damage Claims to the Other Damage Claim Fund; (viii) provides for full and complete releases by holders of allowed Bridge Collapse Bodily Injury Claims, holders of allowed Bridge Collapse Other Damage Claims, and the trustee of the Bridge Collapse Bodily Injury Claims Trust of any and all claims against each Insurer, their respective affiliates and associated third parties who are among the Released Parties, and their respective Insurance Policies; (ix) enjoins all Persons and entities, including without limitation holders of Bridge Collapse Bodily Injury Claims, holders of Bridge Collapse Other Damage Claims, and the trustee of the Bridge Collapse Bodily Injury Claims Trust, from suing on or otherwise pursing any Insurer, or any other Person or entity released by the releases, for any and all released Claims; (x) requires the holders of Bridge Collapse Bodily Injury Claims and Bridge Collapse Other Damage Claims to release Claims against FIU and FDOT; and (xi) permits holders of Non-Bridge Collapse Claims to pursue such claims to the extent of applicable policy limits of the GIC Policy, and subject to all of the terms, conditions, exclusions and limitations thereof.

1.34    "Policy Limits" shall have the meaning given in the Recitals.

1.35    "Released Parties" shall have the meaning given in the Recitals, and for purposes of the Plan of Reorganization and Plan Confirmation Order shall include FIU and FDOT.

1.36    "Releases" shall have the meaning given in Section 4.1 hereof.

1.37    "Settlement" shall have the meaning given in Section 2.1 hereof.

1.38    "Settlement Approval Order" means a Final Order of the Bankruptcy Court entered in the Bankruptcy Case in the form attached hereto as Exhibit A.

1.39    "Settlement Motion" means a motion to be filed by MCM in the Bankruptcy Case, in form and substance reasonably acceptable to the Insurers, requesting entry of the Settlement Approval Order.

1.40    "XL" shall have the meaning given in the preamble.

1.41    "XL Policies" shall have the meaning given in the Recitals.

II.    THE SETTLEMENT

2.1    Subject to the terms and conditions of this Agreement, the Insurers shall pay, as provided for herein, the Applicable Policy Limit to MCM in full and final exhaustion of the Policy Limits and extinguishment of each Insurer's obligations under the Insurance Policies, subject to the GIC Policy Exception (the "Settlement").

2.2    The Insurers shall pay the Applicable Policy Limit to MCM not later than ten (10) days after the Settlement Approval Order becomes a Final Order.

2.3    Until the Plan of Reorganization is confirmed, the Confirmation Order becomes a Final Order, and the Applicable Policy Limit is transferred to the Bridge Collapse Bodily Injury Claims Trust and the Other Damage Claim Fund as contemplated by this Agreement, MCM shall hold the Applicable Policy Limit in the trust account of its counsel for the benefit of holders of Bridge Collapse Bodily Injury Claims and Bridge Collapse Other Damage Claims (subject to the Insurers' rights under Section 6.2 hereof) and shall not commingle the Applicable Policy Limit with any other assets of the Estate.

2.4    The Parties agree that, subject to the GIC Policy Exception: (i) the Applicable Policy Limit is the maximum amount the Insurers are obligated to pay on account of any and all

Claims of any kind made under or related to the Insurance Policies arising from the Bridge Collapse or otherwise; and (ii) the Applicable Policy Limit is equal to or greater than the fair value of MCM's interests in the Insurance Policies. The Parties further agree that, subject to the GIC Policy Exception and to the entry of the Approval Orders: (i) under no circumstance will the Insurers ever be obligated to make any additional payments to MCM or the Estate or any other Person or entity under the Insurance Policies; (ii) all limits of liability of the Insurance Policies, including all per occurrence and aggregate limits, are and shall be deemed to be fully and properly exhausted; and (iii) all obligations of the Insurers under the Insurance Policies are and shall be deemed to be extinguished.

2.5    MCM represents and warrants that the Applicable Policy Limit is the maximum amount that the Insurers shall be obligated to pay with respect to all Claims and that MCM has not at any time on or after March 15, 2018, without the consent of the Insurers, entered into, and shall not henceforth enter into, any settlements of any Claims pursuant to which the Insurers may be obligated to pay any amounts under the Insurance Policies; provided, however, that nothing in this Agreement shall bar or prohibit MCM from making distributions to the holders of allowed Claims under and pursuant to the Plan of Reorganization.

2.6    MCM agrees that, subject to the GIC Policy Exception, from and after May 31, 2019: (a) all of MCM's outstanding tenders to the Insurers for defense and/or indemnity of any Claims shall be deemed withdrawn; (b) MCM shall not tender to the Insurers any Claims; (c) MCM will not request that the Insurers fund any judgments or settlements of any Claims; and (d) the Insurers shall have no obligation to pay, handle, object to, or otherwise respond to any Claims. Nothing in this Agreement shall bar or prohibit MCM from tendering any Non-Bridge

Collapse Claims to GIC or from tendering any claims to the Insurers under any policy of insurance other than one of the Insurance Policies.

2.7    MCM and GIC agree that GIC's duty to defend MCM in the Bridge Collapse Bodily Injury Claims and the Bridge Collapse Other Damage Claims pursuant to the GIC Policy shall terminate on the Approval Date or such earlier time as all holders of Bridge Collapse Bodily Injury Claims and holders of Bridge Collapse Other Damage Claims release such claims against MCM.

2.8    MCM and the Insurers agree that nothing in this Agreement is intended to be or shall be construed as a waiver of MCM's rights as an additional insured under any policy of insurance other than the Insurance Policies which rights shall be retained by MCM and its bankruptcy estate, or as a waiver of any of MCM's rights as an additional insured that have been assumed by the Insurers or to which the Insurers are subrogated as a matter of law or equity.

2.9    MCM and the Insurers agree that nothing in this Agreement is intended to be or shall be construed as a waiver of any Party's rights or obligations under the *Order Granting Debtor's Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Continue Certain Premium Financing Arrangements Relating Thereto; and (III) Honor Certain Obligations In Respect Thereof* (Doc. No. 78).

2.10    MCM and GIC agree that, notwithstanding payment of the Applicable Policy Limit pursuant to this Agreement, holders of Non-Bridge Collapse Claims shall be permitted, pursuant to the Plan Confirmation Order, to pursue such claims solely to the extent of the applicable policy limits of the GIC Policy, subject to all of the terms, conditions, exclusions and limitations thereof.

III.    BANKRUPTCY COURT APPROVAL OF THE SETTLEMENT

3.1    This Agreement and the transactions contemplated hereby are subject to the approval of the Bankruptcy Court.

3.2    MCM shall file the Settlement Motion within ten (10) days of the Execution Date. MCM shall use its good faith efforts to obtain the Settlement Approval Order and will vigorously defend any objection to the Settlement Motion filed by any Person or entity.

3.3    MCM shall file the Plan of Reorganization promptly, but in no event later than sixty (60) days after the Execution Date. MCM shall use its good faith efforts to obtain the Plan Confirmation Order and will vigorously defend any objection to the Plan of Reorganization filed by any Person or entity.

3.4    If either of the Approval Orders (or any other order of the Bankruptcy Court relating to this Agreement) shall be appealed by any Person or entity (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), MCM shall take all reasonable steps to defend against such appeal, petition or motion: *provided*, *however*, that nothing herein shall preclude the Parties, at the election of the Insurers, from consummating the Settlement and the transactions contemplated herein if the Approval Orders shall have been entered and have not been stayed and the Insurers, in their sole discretion, waive in writing the requirement that each of the Approval Orders be a Final Order.

3.5    The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, the Approval Orders (or any other order of the Bankruptcy Court relating to this Agreement), except to the extent that any such order shall be inconsistent with the terms hereof.

3.6    The Parties shall cooperate in seeking and obtaining Bankruptcy Court approval of the Settlement. Such cooperation shall include, without limitation, consulting with each other concerning the status of the Bankruptcy Case, including the status of the Settlement Motion and the Plan of Reorganization, and MCM providing the Insurers with drafts of requested motions, notices, certificates of service, proposed orders and other pleadings and documents relating to the Settlement, including without limitation the Settlement Motion, the Plan of Reorganization and the Approval Orders, as soon as reasonably practicable so as to afford the Insurers a reasonable opportunity to review and comment on any such pleadings and documents in advance of filing or presentment.

3.7    None of the Parties shall file any motion, adversary proceeding, response, objection or other pleading or document in the Bankruptcy Case requesting the entry of an order or the granting of other relief which could conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and/or the rights of the Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the Settlement and the transactions contemplated by this Agreement, including any transaction contemplated by and to be approved pursuant to the Settlement Motion, the Plan of Reorganization and the Approval Orders; *provided*, *however*, that this Section 3.7 shall not bind the Insurers if they, or any one of them, shall have terminated this Agreement pursuant to Section 6.2 hereof.

3.8    In the event any Person or entity asserts a Claim against any of the Insurers or other Released Parties after the Approval Date, the Insurers shall notify MCM in writing and MCM shall immediately seek an order from the Bankruptcy Court enforcing the Approval Orders and the Injunction and enjoining such Claim, as the Insurers may elect and direct. In the

event that MCM fails to seek an Order from the Bankruptcy Court as required under this Section 3.7, the Insurers may seek such an Order.

IV.    RELEASES BY MCM IN FAVOR OF THE INSURERS

4.1    Subject to the provisions of Section 6.2 of this Agreement, effective upon the Insurers' payment of the Applicable Policy Limit to MCM, and without any further action of the Parties, MCM, on behalf of itself and the Estate, hereby fully, finally, and completely remises, releases, acquits and forever discharges the Insurers and the other Released Parties from any and all Claims, subject to the GIC Policy Exception, whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, or suspected or unsuspected (the "Releases").  The Releases of the Insurers and the other Released Parties under this Section 4.1 shall include, but shall not be limited to, any and all Claims for coverage under the Insurance Policies arising out of or relating to or in any way involving the Bridge Collapse, whether for wrongful death, personal injury, emotional distress, property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Insurance Policies.  In addition, MCM, on behalf of itself and the Estate, hereby withdraws any and all requests, demands, or tenders for defense or indemnity previously submitted to the Insurers under the Insurance Policies arising out of or relating to or in any way involving the Bridge Collapse, and further surrenders, relinquishes, and releases any further right to tender or present any Claims whatsoever to the Insurers under the Insurance Policies.  Furthermore, by virtue of the foregoing Releases and the Approval Orders, subject to the GIC Policy Exception, the Insurers shall have no duty to defend or indemnify MCM, on behalf of itself and the Estate, or any other insured under the Insurance Policies with respect to any past, present, or future Claim, nor shall the Insurers have any other duty or obligation

whatsoever to any other Person or entity with respect to any and all Claims. The Parties expressly waive any and all rights they may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release as to Claims released herein and in the Plan of Reorganization and the Approval Orders.

4.2    Releases Do Not Extend To Obligations Under The Agreement. The Releases of the Insurers set forth in Section 4.1 above are not intended to, and shall not, extend to or otherwise release or discharge any rights, privileges, benefits, duties, or obligations of any of the Parties by reason of, or otherwise arising under, the Agreement.

4.3    Changes In Fact Or Law. The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Insurance Policies or otherwise and/or that the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims herein released. Nevertheless, the Parties hereby agree that the Releases set forth above, and the releases provided for in the Plan of Reorganization and approved by the Approval Orders, shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

4.4    Reinsurance. The Releases set forth in Section 4.1 above shall not apply to or have any effect on the Insurers' rights to any claim for reinsurance in connection with the Insurance Policies, nor shall the Insurers' assertion of any claim for reinsurance affect the Insurers' obligations under this Agreement.

4.5    Beneficiaries Of Release. Subject to the other provisions of this Agreement, to the extent that the Releases set forth in Section 4.1 above run in favor of any Persons or entities who

or that are not signatories hereto, this Agreement is hereby declared to be made for their respective benefits.

4.6    No Assignment of Claims.    MCM represents and warrants that it has not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims that are the subject of the Releases set forth in Section 4.1 above.

V.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

The Insurers represent and warrant, and subject to the entry of the Approval Orders, MCM represents and warrants, as follows:

(a)    That it has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder;

(b)    That the execution and delivery of and the performance of its obligations under this Agreement have been approved by a duly authorized representatives of the Party, and by all other necessary actions of the Party;

(c)    That it has expressly authorized its undersigned representative to execute and deliver this Agreement on the Party's behalf;

(d)    That this Agreement has been thoroughly negotiated and analyzed by its counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations, and for good and valuable consideration; and

(e)    That it will use its or his best efforts to obtain the Approval Orders.

VI.    MISCELLANEOUS PROVISIONS

6.1    Conditions Precedent. Subject to Section 6.2 below, this Agreement is expressly subject to satisfaction of the following conditions:  (i) that the Settlement Approval Order

becomes a Final Order; (ii) that the Insurers pay the Applicable Policy Limit of the Insurance Policies to MCM; and (iii) that the Plan Confirmation Order becomes a Final Order.

6.2    <u>Termination Rights</u>.  If the Bankruptcy Court denies the Settlement Motion or otherwise declines to enter the Settlement Approval Order, the Settlement Approval Order does not become a Final Order by June 30, 2019, the Bankruptcy Court denies confirmation of the Plan of Reorganization or otherwise declines to enter the Plan Confirmation Order, the Plan Confirmation Order does not become a Final Order within one hundred eighty (180) days after the Petition Date, or either of the Approval Orders are vacated or modified in a way that is not acceptable to the Insurers in their sole discretion or are reversed on appeal such that they do not become Final Orders, the Insurers, or any one of the Insurers, may terminate this Agreement by delivering written notice of such termination to MCM. In the event that this Agreement is terminated:  (i) this Agreement shall be deemed null and void; (ii) the Insurers shall not be obligated to pay the Applicable Policy Limit to MCM (or if the Insurers already have paid the Applicable Policy Limit to MCM, MCM shall return the Applicable Policy Limit to the Insurers); (iii) the Parties shall have all of the claims, defenses, rights and obligations under or with respect to the Insurance Policies that they would have had absent this Agreement; and (iv) any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that the Agreement is terminated.

6.3    <u>Amendments</u>. Neither this Agreement nor any term or  condition set forth herein may be amended, modified, altered, changed, waived, discharged, or terminated except by a writing signed by each of the Parties (or their successors or assigns).

6.4     No Precedential Value.  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any of the Insurance Policies.  This Agreement shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Insurers under any of the Insurance Policies, *provided*, *however*, that subject to Section 6.15 below, this Agreement may be used as evidence in any defense of or by the Insurers of any obligation arising under the Insurance Policies.

6.5     Agreement Voluntarily Entered Into By Each Of The Parties. This Agreement is entered into voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice of competent legal counsel of their own choosing.

6.6     Interpretation. This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, neither Party shall be presumptively entitled to have any provisions of the Agreement construed against the other Party in accordance with any rule of law, legal decision or doctrine.

6.7     No Admission of Liability. The Parties agree that this Agreement is the result of a compromise, and that the execution and delivery of this Agreement by any of the Parties shall not constitute or be construed as an admission of any liability, a course of performance, or wrongdoing on the part of any of them. The Parties acknowledge that this Agreement is not and shall be construed as an admission by the Insurers that any defense, indemnity, or other coverage

obligation exists under the Insurance Policies or that the Insurers have any other obligations of any nature whatsoever with respect to the Insurance Policies. By entering into this Agreement, MCM and the Insurers have not waived nor will be deemed to have waived any right, obligation, privilege, defense or position it may have asserted or might assert in connection with any claim, matter, Person, entity or insurance policy outside the scope of this Agreement.   Except as expressly provided in Section 4.6 above, no Person or entity other than the Parties hereto shall have any legally enforceable rights or benefits under this Agreement.

      6.8    No Fraudulent Transfer.   This Agreement, having been negotiated at arm's length in settlement of bona fide disputes and supported by adequate consideration, is not a preference under section 547 of the Bankruptcy Code, a fraudulent conveyance under sections 546 or 548 of the Bankruptcy Code, or avoidable under any other applicable bankruptcy or non-bankruptcy law. The Parties agree that the rights and interests being transferred hereunder are being transferred in exchange for reasonably equivalent value, and that upon the Execution Date, the Parties shall be deemed estopped and barred from challenging the reasonably equivalent value of the amount paid pursuant to the Settlement. The Parties agree to assert in any proceeding challenging this Agreement or seeking to avoid any part of this Agreement that this Agreement was for equivalent value as set forth above, was reached in good faith and was negotiated with the advice of counsel.

      6.9    Attorneys' Fees, Costs, And Expenses. Each of the Parties shall bear its own attorneys' fees, costs, and expenses in connection with the negotiations for and preparation of this Agreement.   Additionally, each Party shall bear the attorneys' fees, costs, and expenses that it may incur in connection with the Bankruptcy Case, including without limitation the prosecution of the Settlement Motion and the Plan of Reorganization.

6.10    Entire And Integrated Agreement. This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of their agreement and understanding of the Parties with respect to the subject matter hereof. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matter hereof, and there are no promises, representations, warranties, agreements, understandings, or undertakings with respect to the subject matter hereof other than those expressly set forth herein.

6.11    No Third Party Beneficiaries. Except as set forth in Section 4.6 above, nothing in this Agreement is intended or shall be construed to give any Person or entity, other than MCM (on its own behalf and on behalf of the Estate) and the Insurers, and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein.

6.12    Severability. If any provisions of this Agreement, or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties. Notwithstanding the foregoing, all of the conditions precedent in this Agreement will remain in full force and effect following any determination that any other provisions of this Agreement are invalid or unenforceable.

6.13    Notice. Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid, or

{34266: 021: 02582044.DOCX :6 }                    21

email to the Parties at the addresses set forth below or to such other Persons as any of them may designate in writing from time to time:

      (a)    As to XL:

        Sarah Mims
        General Counsel US Insurance
        AXA XL, a division of AXA
        505 Eagleview Blvd.
        Exton, PA 19341
        sarah.mims@axaxl.com

        With a simultaneous copy to:

        Louis H. Kozloff, Esq.
        Goldberg Segalla
        1700 Market Street
        Suite 1418
        Philadelphia, PA 19103
        lkozloff@goldbergsegalla.com

        -and-

        Timothy W. Brink, Esq.
        Meltzer Purtill & Stelle LLC
        300 South Wacker Drive
        Suite 2300
        Chicago, IL 60606
        tbrink@mpslaw.com

      (b)    As to Ohio Casualty:

        Adam Woellert
        Ohio Casualty Insurance Company
        175 Berkeley Street
        Boston, MA  02116
        Adam.Woellert@LibertyMutual.com

        With a simultaneous copy to:

        Robert L. Hoegle, Esq.
        Nelson Mullins Riley & Scarborough LLP
        101 Constitution Avenue NW
        9th Floor
        Washington, DC 20001
        bob.hoegle@nelsonmullins.com

-and-

Peter J. Haley, Esq.
Nelson Mullins Riley & Scarborough LLP
1 Post Office Square
30th Floor
Boston, MA  02109
peter.haley@nelsonmullins.com

(c)    As to MCM:

Pedro R. Munilla
Daniel F. Munilla
Magnum Construction Management, LLC
6201 S.W. 70th Street
First Floor
Miami, FL 33143
prmunilla@mcm-us.com
dmunilla@mcm-us.com

With a simultaneous copy to:

Andrew R. Kruppa
Squire Patton Boggs
200 South Biscayne Blvd.
Suite 4700
Miami, FL 33131
Andrew.kruppa@squirepb.com

-and-

Jordi Guso, Esq.
Berger Singerman
1450 Brickell Avenue
Suite 1900
Miami, FL  33131
jguso@bergersingerman.com

6.14    <u>Headings</u>. The section titles, captions, and headings contained in this Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

6.15    Recitals. The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

6.16    Agreement Inadmissible. Any evidence of the terms or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes establishing any rights, duties or obligations of the Parties, except as follows:  (i) in any action or proceeding to enforce this Agreement or the Injunction; (ii) in any proceedings before the Bankruptcy Court to secure the Approval Orders; (iii) in any possible action or proceeding involving the Insurers and any of their reinsurers bearing responsibility for any of the Insurers' obligations under this Agreement.

6.17    Additional Documents. The Parties agree to execute such additional documents as reasonably may be required in order to carry out the purpose and intent of this Agreement, or to evidence anything contained herein.

6.18    Execution in Counterparts. This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

6.19    Rules of Construction. As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate, "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every." Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively; (ii) the terms "hereof," "herein," "hereby" and derivative

or similar words refer to this entire Agreement; (ill) the words "Include," "includes" or "Including" shall be deemed to be followed by the words "without limitation," and (iv) the word "or" shall be disjunctive but not exclusive, References to this Agreement and other documents shall be deemed to include all subsequent amendments and other modification thereto.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date set forth, along with the respective signatures, below.

**Greenwich Insurance Company:**

Name:_____
Its:_____

Dated: _____

**XL Insurance America, Inc.:**

Name:_____
Its:_____

Dated: _____

**Indian Harbor Insurance Company:**

Name:_____
Its:_____

Dated: _____

**The Ohio Casualty Insurance Company:**

_Adam K. Woellert_
Name:_ Adam K. Woellert_____
Its:_ Sr. Tech. Claims Specialist_____

Dated:  4/29/2019_____

**Magnum Construction Management, LLC, f/k/a Munilla Construction Management:**

Name:_____ PEDRO MUNILLA, MEMBER, MGR
Its:_ MEMBER MANAGER_____

Dated: 4/29/19_____

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date set

forth, along with the respective signatures, below.

**Greenwich Insurance Company:**

Name: _Michael C. Testone_
Its: _Head of U.S. Casualty Claims_

Dated: _April 29, 2019_

**XL Insurance America, Inc.:**

Name: _Michael C. Testone_
Its: _Head of U.S. Casualty Claims_

Dated: _April 29, 2019_

**Indian Harbor Insurance Company:**

Name: _Michael C. Testone_
Its: _Head of U.S. Casualty Claims_

Dated: _April 29, 2019_

**The Ohio Casualty Insurance Company:**

Name:_____
Its:_____

Dated: _____

**Magnum Construction Management, LLC,
f/k/a Munilla Construction Management:**

Name:_____
Its:_____

Dated: _____

# EXHIBIT "B"

137889-1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

IN RE:                                                        Chapter 11 Case

MAGNUM CONSTRUCTION MANAGEMENT,                               Case No.: 19-12821-AJC
LLC f/k/a Munilla Construction Management, LLC, [1]

      Debtor.

_____/

**ORDER: (A) APPROVING COMPROMISE AND SETTLEMENT AGREEMENT; (B)
AUTHORIZING AND DIRECTING THE DEBTOR TO ENTER INTO AND PERFORM
UNDER SETTLEMENT AGREEMENT; (C) ENJOINING CERTAIN CLAIMS
AGAINST CERTAIN INSURERS; AND (D) GRANTING RELATED RELIEF**

      **THIS MATTER** came before the Court on the _____ day of May, 2019 at _____a.m./p.m.

(the "Hearing") in Miami, Florida, upon the *Motion to (A) Approve Compromise and Settlement*

*Agreement; (B) Authorize and Direct the Debtor to Enter into and Perform Under Settlement*

*Agreement; (C) Enjoin Certain Claims Against Certain Insurers; and (D) Granting Related*

*Relief* (the "Insurance Settlement Motion") [ECF No. ] filed by Magnum Construction

Management, LLC, f/k/a Munilla Construction Management, LLC, as debtor and debtor-in-

_____

[1]  The Debtor's address is 6201 SW 70th Street, 1st Floor, Miami, FL 33143.  The last four digits of the Debtor's federal tax identification number are 3403.

possession (the "Debtor") on [_____], 2019.  On April __, 2019, this Court entered its *Order Approving Form and Manner of Notice of Insurance Settlement* [ECF No. ___] (the "Settlement Procedures Order") approving the form and manner of notice to be provided by the Debtor in connection with the Insurance Settlement Motion and the transactions contemplated thereby.

The Court having conducted a Hearing; notice of the Settlement Motion and the Hearing having been given in accordance with the Settlement Procedures Order, thereby affording all interested parties an opportunity to be heard with respect to the Settlement Motion; the appearances of interested parties wishing to be heard on the Settlement Motion, if any, having been duly noted in the record of the Hearing; the Court having reviewed and considered the Settlement Motion, all briefs, declarations and documents submitted by the Debtor in support thereof, all responses in support of and objections to the Settlement Motion submitted by interested parties, if any, and the arguments made by counsel and the evidence proffered or adduced at the Hearing; the Court having determined that granting the relief requested in the Insurance Settlement Motion, including approving the Settlement Agreement, authorizing and directing the Debtor to enter into and perform under the Settlement Agreement, and enjoining certain claims against certain insurers, is in the best interests of the Debtor, the Debtor's estate, its creditors, and other parties in interest;; and upon the record of the Hearing and this case and after due deliberation and good and sufficient cause appearing therefore;

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

A. The findings of fact and conclusions of law set forth herein constitute the Court's combined findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of

---

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  <u>See</u> FED. R. BANKR. P. 7052.

Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.  The Court has jurisdiction over the Insurance Settlement Motion pursuant to 28 U.S.C. §§ 157 and 1334. It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of the Settlement Agreement and this Order and, if necessary, to adjudicate any and all disputes arising out of or relating to or in any way involving the Settlement Agreement or this Order.

C.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

D.  Venue of this case and the Insurance Settlement Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.  The statutory predicates for the relief sought in the Insurance Settlement Motion are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 2002(a), 6004(a), 9014, and 9019(a).

F.  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), this Order shall not be stayed but shall be effective immediately.

G.  In accordance with the Settlement Procedures Order, the Debtor provided written notice of the Insurance Settlement Motion and the Hearing to: (i) all creditors whose claims were scheduled by the Debtor; (ii) all creditors who have filed proofs of claim in the Bankruptcy Case; (iii) all Persons or entities who have filed a notice of appearance or otherwise have appeared in or requested notices in the Bankruptcy Case; (iv) holders of Bridge Collapse Bodily Injury Claims (including but not limited to those identified in Schedule A to the Settlement Agreement) and Bridge Collapse Other Damage Claims; (v)

the Insurers; (vi) any other insurance companies to which the Debtor tendered a claim arising out of or relating to the Bridge Collapse; (vii) holders of Non-Bridge Collapse Claims; (viii) FIU; (ix) FDOT; (x) the United States Trustee; (xi) counsel for the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case; and, (xii) for each of the above, such Person's or entity's counsel of record in the Bankruptcy Case and, in the case of holders of Bridge Collapse Bodily Injury Claims and Bridge Collapse Other Damage Claims, in any pre-Petition Date litigation by, against, or involving the Debtor.  Such notice was proper, timely, adequate, sufficient,  and in full compliance with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and the Local Rules of this Court.  Such notice was reasonable and appropriate under the circumstances and provided all interested parties with a reasonable opportunity to be heard with respect to the Insurance Settlement Motion.  No other or further notice of the Insurance Settlement Motion or the Hearing is necessary or shall be required.

H.  The Insurance Policies[3] are property of the Debtor's estate pursuant to 11 U.S.C. § 541(a).

I.   Subject to the GIC Policy Exception, the Applicable Policy Limit constitutes the limits of liability of the Insurance Policies that are applicable to Claims against the Debtor and that provide coverage to the Debtor for those Claims.

J.   The Claimants are adequately protected by the terms of the Settlement Agreement as any Claims held by them can be asserted with equal force and effect against the Applicable Policy Limit, which amount equals the value of the Debtor's interest in the

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Settlement Agreement.

Policies and/or any Claims against the Insurers, and which shall be paid to the Debtor in accordance with the terms and conditions of the Settlement Agreement.

K. Payment of the Applicable Policy Limit fully and completely exhausts the Policy Limits of the Insurance Policies, and, subject to the GIC Policy Exception, extinguishes each Insurer's obligations under the Insurance Policies.

L.  Subject to the GIC Policy Exception, the Applicable Policy Limit is the maximum amount the Insurers are obligated to pay on account of any and all Claims of any kind made under or related to the Insurance Policies arising from the Bridge Collapse or otherwise and constitutes valid consideration for the Releases given by the Debtor pursuant to the Settlement Agreement.

M. The Settlement was negotiated and has been entered into by the Parties in good faith, from arm's length bargaining positions, with the advice of counsel, and without fraud or collusion.

N. The transfers contemplated by the Settlement Agreement constitute transfers for reasonably equivalent value, in good faith and fair and adequate consideration under the Bankruptcy Code and other applicable non-bankruptcy law.

O. Neither the Settlement Agreement nor the transfers contemplated by the Settlement Agreement are subject to avoidance pursuant to Article 5 of the Bankruptcy Code or other applicable non-bankruptcy law.

P.  The Debtor has demonstrated sound business justifications for entering into and consummating the transaction contemplated by the Settlement Agreement and the Insurance Settlement Motion, including liquidation of all available insurance for the Applicable Policy Limit without the necessity of further litigation or mediation, the transfer of third party

claims to the cash value of the insurance settlement and the avoidance of further cost, expense and delay otherwise attendant to pursuing an alternative course; and the paramount interest of the creditors and a proper deference to their reasonable views.

Q. The Settlement is fair and equitable and falls above the lowest point on the range of reasonableness because, among other things, the Settlement brings the Applicable Policy Limit into the Debtor's estate without the need for litigation or delay in collection, and serves the paramount interest of the affected creditors and gives proper deference to their reasonable views with respect to the Settlement.

R. The Settlement is the product of, and the decision to enter into the Settlement Agreement represents, the sound exercise of the Debtor's business judgment.

S. The Settlement is in the best interests of the Debtor, the Debtor's estate, its creditors and other parties in interest.

NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:

1.    The Insurance Settlement Motion is GRANTED.

2.    For the reasons set forth herein and in the record of the Hearing, all objections to the Insurance Settlement Motion or the relief requested therein or to the entry of this Order that have not been withdrawn, waived or otherwise resolved, are overruled in their entirety.

3.    Notice of the Hearing was fair and adequate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

4.    The Settlement Agreement and the consideration provided under the Settlement Agreement is fair and reasonable.

6

5.      The Settlement Agreement, in the form attached to the Insurance Settlement Motion, and all of the terms and conditions thereof, is APPROVED.

6.      The Parties are authorized and directed (a) to enter into and perform under the Settlement Agreement, (b) to take all steps necessary to consummate the Settlement and implement the terms of the Settlement Agreement, and, in furtherance thereof, (c) to take such actions and to enter into, execute, deliver, and perform under such additional instruments and documents as reasonably may be necessary or desirable to consummate the Settlement and implement the terms of the Settlement Agreement and this Order.

7.      The Insurers' payment of the Applicable Policy Limit of the Insurance Policies fully and completely exhausts the Policy Limits, and extinguishes each Insurer's obligations under the Insurance Policies, arising out of or relating to or in any way involving the Bridge Collapse.

8.      Subject to the GIC Policy Exception, the Applicable Policy Limit is the maximum amount that the Insurers shall be obligated to pay on account of any and all Claims.

9.      The Releases given by the Debtor in favor of the Insurers are hereby APPROVED.

10.     None of the Parties, nor the holder of any Claim, nor any subsequently appointed trustee or estate representative of, or for, the Debtor or the Debtor's estate, shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or by the Settlement Agreement or this Order.

11.     All Persons or entities holding or potentially holding a Claim against the Insurers or any other Released Parties (as defined in the Settlement Agreement as "Claimants") are permanently and forever barred, estopped, stayed and enjoined from: (i) pursuing any Claim

against the Insurers and the other Released Parties; (ii) continuing or commencing any action or other proceeding with respect to any Claim against the Insurers or the other Released Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the Insurers or the other Released Parties or any property of the Insurers or the other Released Parties with respect to any Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Insurers or the other Released Parties or any property of the Insurers or the other Released Parties with respect to any Claim; and/or (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Insurers or the other Released Parties with respect to any Claim (all of which are defined in the Settlement Agreement as the "Injunctions").

12.    Subject to the terms and conditions of the Settlement Agreement, including without limitation sections 2.3 and 6.2 thereof, the Debtor shall hold the Applicable Policy Limit in the trust account of its counsel for the benefit of holders of Bridge Collapse Bodily Injury Claims and Bridge Collapse Other Damage Claims, and shall not commingle the Applicable Policy Limit with any other assets of the Debtor's estate.

13.    The Settlement Agreement and this Order, including without limitation the Releases and the Injunctions, shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, any successors thereto (including without limitation any trustee in bankruptcy, liquidating trustee, or other estate representative), the Claimants and all parties in interest in this case, the Insurers, the Released Parties, and each of the their respective affiliates, members, officers, directors, successors and permitted assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under

any chapter of the Bankruptcy Code or any trustee(s), receiver(s) or similar person(s) under applicable non-bankruptcy law, as to which trustee(s), receiver(s) and person(s) such terms and provisions likewise shall be binding.

14.     This Court retains and shall have exclusive jurisdiction: (a)  to interpret and enforce the terms and provisions of the Settlement Agreement and this Order, (b) to adjudicate any and all disputes arising out of or relating to or in any way involving the Settlement Agreement or this Order; and (iii) to implement the terms and provisions of the Settlement Agreement, any amendments thereto, any waivers and consents thereunder, and any agreements executed in connection therewith.

15.     The failure specifically to include or reference any particular provisions of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provisions, and the Settlement Agreement and each and every provision thereof is, by this Order, authorized and approved in its entirety.

16.     The Parties are authorized to make non-material changes to the Settlement Agreement and any related agreements, documents, or other instruments, including modifications, amendments, or supplements agreed upon by the Parties in accordance with the terms thereof, without further order of this Court.

17.     This Order shall be effective immediately upon entry, and shall not be stayed pursuant to Bankruptcy Rule 6004(h) or any other applicable Bankruptcy Rule or Local Rule of this Court.

# # #

Submitted by:
Jordi Guso, Esq.
Paul A. Avron, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900

Miami, FL 33131
Tel. (305) 755-9500
Fax (305) 714-4340
Email:  jguso@bergersingerman.com
Email:  pavron@bergersingerman.com

Copies furnished to:
Jordi Guso, Esq.
*(Attorney Guso is directed to serve a signed copy of this Order upon all interested parties and to file a Certificate of Service with the Court.)*